**NATIONAL KEROSENE HEATER ASSOCIATION, INC., Plaintiff,**

v.

**COMMONWEALTH OF MASSACHUSETTS, et al., Defendants.**

**Civ. A. No. 86–0847–S.**

United States District Court, D. Massachusetts.

May 19, 1986.

Defendants Motion for Summary Judgment Feb. 24, 1987.

Thomas F. Holt, Jr., DiCara, Selig, Sawyer & Holt, Boston, Mass., for plaintiff.

E. Michael Sloman, Thomas A. Barnico, Asst. Attys. Gen., Government Bureau, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

SKINNER, District Judge.

The plaintiff, National Kerosene Heater Association, Inc. ("NKHA"), brings this action to challenge the constitutionality of M.G.L. c. 148, §§ 5A and 25B, as amended by Mass.St.1985, c. 625, which ban the sale and use of unvented liquid fired space heaters in Massachusetts. NKHA asserts that the Commonwealth's statutory scheme is preempted by the supremacy clause of the United States Constitution, the Consumer Product Safety Act, 15 U.S.C. § 2051 *et seq.* and certain administrative actions taken by the Consumer Product Safety Commission. NKHA also contends that the statutes violate the commerce clause of the United States Constitution, the equal protection and due process guarantees of the Fifth and Fourteenth Amendments to the United States Constitution and the Massa-

chusetts Declaration of Rights. In addition to declaratory and injunctive relief, NKHA seeks monetary damages from the Commonwealth and the individual defendants, the Attorney General, the Secretary of Public Safety, and the State Fire Marshal, in both their individual and official capacities.

On March 13, 1986, I denied plaintiff's request for a temporary restraining order and ordered the Commonwealth to file promptly an opposition to plaintiff's motion for a preliminary injunction and a motion for summary judgment on the preemption issues. I also ordered, and counsel for all parties agreed, that the application for a preliminary injunction be consolidated with trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2).

Defendants have now moved for summary judgment on all claims. Plaintiff opposes the motion and has filed a cross-motion for partial summary judgment limited to the preemption issue. However, relying on my briefing order of March 13, 1986, plaintiff has not briefed or argued the issues raised by defendants' motion concerning the commerce clause, due process and equal protection challenges or the individual defendants' assertion of official immunity. NKHA merely asserts that factual disputes exist which render summary judgment inappropriate on these issues. Because these factual disputes may be immaterial, plaintiff is directed to file a brief specifying the materiality of each alleged dispute and the evidence which makes the dispute "genuine". Fed.R.Civ.P. 56(c); *see White v. Hearst Corp.*, 669 F.2d 14, 18 (1st Cir.1982) (quoting *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)). This opinion will address only the preemption issues.

### A. *The Massachusetts Statutory Scheme.*

The Commonwealth first regulated the use of unvented space heaters in 1962, when the legislature enacted M.G.L. c. 148, §§ 5A and 25B, St. 1962, c. 636 and 688,

§ 1. As originally enacted, these sections provided:

*Section 5A:*

No person shall use or allow to be used a portable wick-type space heater in any building which is used in whole or in part for human habitation. Whoever violates the provisions of this section shall be punished by a fine of not more than one hundred dollars.

*Section 25B:*

On and after July first, nineteen hundred and sixty-five, no person shall use or allow to be used a space heater in any building which is used in whole or in part for human habitation. As used in this section, "space heater" includes portable space heater, parlor heater, cabinet heater, room heater and any similar heater having a barometric fed fuel control and its fuel supply tank located less than forty-two inches from the center of the burner and means the type of heating appliance adapted for burning kerosene, range oil or number one fuel oil and used principally for the heating of the space in and adjacent to that in which such appliance is located. Whoever violates any provision of this section shall be punished by a fine of not more than one hundred dollars.

These sections were amended by an Act, Mass. St.1985, c. 625, which was signed into law by the governor of the Commonwealth on December 23, 1985. The Act deleted the first sentence of each section and inserted in place thereof the sentence, "No person shall use, allow to be used, sell or offer for sale any unvented liquid-fired space heater." The other portions of §§ 5A and 25B, including the criminal penalties and the definition of "space heater" in § 25B, remain unchanged.

A comparison of the original and amended versions of §§ 5A and 25B reveals that the Act had several effects:

(1) the ban on use provided by both sections is broadened to prohibit any use; formerly, the ban was limited to use in "any

building which is used in whole or part for human habitation";

(2) a prohibition on the sale of unvented liquid-fired space heaters is added to both sections; and

(3) the coverage of § 5A is expanded to include "any unvented liquid-fired space heater", not just "portable wick-type space heater[s]".

As a consequence, there is now in effect a complete ban on the sale or use of any unvented liquid-fired space heater in Massachusetts.

## B. *Factual Background.*

### 1. *The Product.*

This action concerns the extent of permissible state regulation of portable, self-contained, free-standing, unvented, kerosene-fueled space heaters. Unvented heaters lack a flue so that any fumes produced by the heater are released into the area in which the heater operates. Unvented portable kerosene heaters are generally classified as either "old style" or "new generation". Old style heaters were the only type in existence when the initial Massachusetts statutes were enacted in 1962. These heaters were typically cylindrical in shape, with a relatively high center of gravity making them likely to tip over. In one version, fuel for the heater was stored in an inverted fuel tank from which it was fed by gravity to the point of combustion. This fuel system was known as a "barometric-fed" fuel control. As kerosene expands when fed into a warm heater, this system sometimes resulted in an increase of pressure within the tank and an overflow of fuel at the ignition point. Another version of the old style heater relied on a wick fuel-feed device. A large number of domestic fires were attributed to these heaters.

After Massachusetts enacted the original § 5A, dealing with wick-type heaters, and § 25B, concerning barometric-fed heaters, heater manufacturers developed a "new generation" of kerosene heaters. These heaters "incorporate significantly advanced technological designs and safety features not present in the old style units". Complaint ¶ 16. Barometric-fed fuel controls are apparently no longer used, and safety features such as low centers of gravity, tipover switches, shutoff devices, guards and/or grills, leak resistant seals, fuel storage limits, temperature guards, and wick stops have been added. These features attempt to reduce the hazards associated with unvented heaters, including open flames, flareups, tipovers, contact burns, oxygen depletion and carbon monoxide. For purposes of this action, NKHA defines "new generation" heaters as those portable kerosene heaters which comply with the 1984 revision of Underwriters Laboratories Standard for Unvented Kerosene-Fired Room Heaters and Portable Heaters, UL 647 ("UL 647").

### 2. *The Consumer Product Safety Commission's Activities.*

The Consumer Product Safety Commission ("Commission") first examined the safety hazards of portable kerosene heaters in response to a petition to prohibit the sale of the heaters filed under former 15 U.S.C. § 2059. On October 1, 1979, the Director of the Fire Department of Newark, New Jersey petitioned the Commission to declare that portable kerosene heaters are banned hazardous products because of the fire hazards they present. After a year-long investigation, four of the five members of the Commission concluded that "it is not reasonably necessary at this time to address, by mandatory regulation, any risk of injury from fire hazards that may be associated with portable kerosene heaters." 45 Fed.Reg. 70962 (October 27, 1980). In reaching that conclusion, the Commission relied on the relatively low incidence of injuries and consumer use. *Id.* The Commission also noted the existence of state and local regulation of portable kerosene heaters (in 107 of 352 jurisdictions contacted), *id.*, and the then-pending revision of the proposed 1958 Underwriters Laboratories ("UL") standard:

[a]vailable information shows that a more stringent voluntary standard now

under development may be adequate to address any fire hazard that may be associated with portable kerosene heaters where such heaters may be permitted in residences by local laws.

*Id.* at 70961.

Although the Commission denied the petition, Commission staff continued to monitor kerosene heater use, hazard data and progress of the revision of proposed UL 647. In the fall of 1982, the Commission established a priority project to address comprehensively the possible hazards associated with portable kerosene heaters. The first fruit of this project was the June, 1983, Kerosene Heater Report. After review of a number of studies,[1] the staff identified several areas in which the safety of kerosene heaters could be improved. Pl.Ex. 5 at 44, 45. However, the staff did not recommend any mandatory action for two reasons: "[t]here has been continuous progress in upgrading the existing UL Standard" and "[t]he kerosene heater industry has demonstrated, to date, a good faith effort to improve their products for the safety of the consumer". *Id.* at 44. The report also noted "the existence of state and local restrictions on the sale and use of the heaters ..." *Id.* at 17, 20.

The June 1983 Report was updated in March of 1984. An additional report, dated November, 1984, was primarily concerned with emissions from kerosene heaters. The report notes that a task force consisting of representatives from the kerosene heater industry, Commission staff, Underwriters Laboratories and the public had been meeting to "assist U.L. in the development of consensus standards on indoor air quality issues". Pl.Ex. 6 at 3.

A further report was sent to the Commission in April of 1985. In addition to providing updated information and discussing further studies, the report indicates that a number of the Commission's recommendations had been incorporated into the 1984 revision of UL 647. Pl.Ex. 7 at 3, 24. However, the Commission staff did not

agree with all revisions of the standard and sought certain changes and additions. *See id.* at 28–30. Due to the changing nature of the standard, the Commission staff opposed the Underwriters Laboratories proposal that the UL 647 be recognized by the American National Standards Institute as an American National Standard. *Id.* at 3.

In addition to this ongoing staff investigation, the Commission held several public hearings concerning kerosene heaters between 1982 and 1985. *See* 47 Fed.Reg. 47511 (October 26, 1982) (notice of staff briefing for the Commission on the status of kerosene heaters, open to the public); 48 Fed.Reg. 20533 (May 6, 1983) (notice of public Commission meeting with Underwriters Laboratories and the industry to discuss voluntary standard); 49 Fed.Reg. 11286 (March 26, 1984) (notice of staff briefing on the status of voluntary standards for kerosene heaters). The Commission's staff study of kerosene heaters is ongoing.

C. *Preemption.*

NKHA asserts that the Commonwealth's ban on the sale or use of "new generation" unvented kerosene heaters is preempted by federal law and the activities of the Commission.

Federal law may pre-empt state law in any of three ways. First, in enacting the federal law, Congress may explicitly define the extent to which it intends to pre-empt state law. Second, even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible, or when the state law "stands as an ob-

---

1. The report discussed injury data, economic (market) information, evaluations of fire and emission hazards and voluntary standard activities.

stacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Michigan Canners & Freezers Ass'n v. Agricultural Marketing & Bargaining Board,* 467 U.S. 461, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984) (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)) (citations omitted). Furthermore, state law may be preempted by federal regulations as well as federal statutes. *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). Plaintiff NKHA contends that the Commonwealth's ban is expressly preempted by the Consumer Product Safety Act ("CPSA"), 15 U.S.C. § 2051 *et seq.,* impliedly preempted by congressional intent to occupy the field, and in conflict with federal law.

### 1. *Express Preemption.*

NKHA contends that the Commonwealth's regulation of "new generation" kerosene heaters is expressly preempted by the preemption provision of the CPSA, 15 U.S.C. § 2075(a), because the Commission relied on UL 647 as a voluntary consumer product safety standard as required by 15 U.S.C. § 2056(b). The Commonwealth asserts that the Commission must follow the procedure of § 2058(b)(2) and publish a notice in the Federal Register stating it will rely on the voluntary standard before state law is preempted. As this argument hinges on the role of § 2056(b) in the statutory scheme, I turn first to the relevant sections of the CPSA.

The Commission's authority to promulgate mandatory consumer product safety standards is contained in 15 U.S.C. § 2056(a):

The Commission may promulgate consumer product safety standards in accordance with the provisions of section 2058 of this title. A consumer product safety standard shall consist of one or more of any of the following types of requirements:

(1) Requirements expressed in terms of performance requirements.

(2) Requirements that a consumer product be marked with or accompanied by clear and adequate warnings or instructions, or requirements respecting the form of warnings or instructions.

Any requirement of such a standard shall be reasonably necessary to prevent or reduce an unreasonable risk of injury associated with such product.

The Commission is also authorized to promulgate rules declaring a product a banned hazardous product by 15 U.S.C. § 2057. Consumer product safety standards under § 2056(a) and rules declaring a product a banned hazardous product are collectively termed "consumer product safety rules", 15 U.S.C. § 2052(a)(2).

The procedure for developing and promulgating consumer product safety rules is set forth in 15 U.S.C. § 2058. That section provides that "[a] proceeding for the development of a consumer product safety rule shall be commenced by the publication in the Federal Register of an advance notice of proposed rulemaking" which contains specified information and invites comment. § 2058(a). One of required provisions is that the notice "invite any person ... to submit to the Commission ... a statement of intention to modify or develop a voluntary consumer product safety standard to address the risk of injury identified [in the notice] together with a description of a plan to modify or develop the standard". § 2058(a)(6). If any standard is submitted in response to this notice, and the Commission determines that—

(A) compliance with [the] standard ... is likely to result in the elimination or adequate reduction of the risk of injury identified in the notice, and

(B) it is likely that there will be substantial compliance with such standard,

the Commission shall terminate any proceeding to promulgate a consumer product safety rule respecting such risk of injury and shall publish in the Federal Register a notice which includes the determination of the Commission and which notifies the public that the Commission

will rely on the voluntary standard to eliminate or reduce the risk of injury. 15 U.S.C. § 2058(b)(2). Otherwise, the Commission must publish the text of the proposed rule together with a preliminary regulatory analysis. § 2058(c). The Commission then must prepare a final regulatory analysis containing findings with respect to subjects specified in § 2058(f). The Commission must determine, among other required findings, that the rule "is reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with such product", § 2058(f)(3)(A), and,

> in the case of a rule which relates to a risk of injury with respect to which persons who would be subject to such rule have adopted and implemented a voluntary consumer product safety standard, that—
>
> (i) compliance with such voluntary consumer product safety standard is not likely to result in the elimination or adequate reduction of such risk of injury; or
>
> (ii) it is unlikely that there will be substantial compliance with such voluntary consumer product safety standard ...

15 U.S.C. § 2058(f)(3)(D). After the required findings are made, the Commission must promulgate the consumer product safety rule in accordance with 5 U.S.C. § 553. 15 U.S.C. § 2058(d). The rule must specify the date it is to take effect. § 2058(g)(1).

The CPSA expressly provides for the preemption of state or local laws which conflict with Commission standards:

> Whenever a consumer product safety standard under this chapter is in effect and applies to a risk of injury associated with a consumer product, no State or political subdivision of a State shall have any authority either to establish or to continue in effect any provision of a safety standard or regulation which prescribes any requirements as to the performance, composition, contents, design, finish, construction, packaging, or labeling of such product which are designed to deal with the same risk of injury asso-

ciated with such consumer product, unless such requirements are identical to the requirements of the Federal standard.

15 U.S.C. § 2075(a).

The parties differ over the place of voluntary consumer product safety standards in this scheme. The statute provides:

> The Commission shall rely upon voluntary consumer product safety standards rather than promulgate a consumer product safety standard prescribing requirements described in subsection (a) of this section whenever compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed and it is likely that there will be substantial compliance with such voluntary standards.

15 U.S.C. § 2056(b). Assuming, for the moment, that the Commission has implicitly recognized UL 647 as a voluntary consumer product safety standard entitled to deference under § 2056(b), the crucial question is whether UL 647 is thereby entitled to preemptive effect under § 2075(a).

■ Section 2075(a) provides that state and local law are preempted "[w]henever a consumer product safety standard under this chapter is in effect". This condition is not met where the Commission informally relies on a voluntary standard under § 2056(b). A consumer product safety standard is not "in effect" unless it has been promulgated "in accordance with the provisions of section 2058" as required by § 2056(a).

As I read the statute, section 2056(a) and (b), together with § 2057, which is not relevant here, define the Commission's authority to promulgate mandatory regulations. Under § 2056(a), "[t]he Commission may promulgate consumer product safety standards in accordance with the provisions of section 2058", provided that "requirement of [the] standard [is] reasonably necessary to prevent or reduce an unreasonable risk of injury associated with [the] product". Section 2056(b) further limits the authority of the Commission by requiring that the Commission rely on voluntary standards

and refrain from promulgating mandatory standards where "compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed and it is likely that there will be substantial compliance with such voluntary standards".

The crux of the statutory scheme, however, is § 2058, which establishes a comprehensive procedure governing the adoption of standards. The limitations contained in § 2056(a) and (b) are incorporated into this procedure as findings required before a mandatory standard may be promulgated. § 2058(f)(3)(A), (f)(3)(D). Section 2058(a)(6) and 2058(b)(2) provide a procedural avenue by which a voluntary standard meriting deference under § 2056(b) may be publicly recognized.

Acceptance of plaintiff's contentions would eviscerate this carefully designed process. The procedure for formal reliance on a voluntary standard provided by § 2058(b)(2) would be rendered meaningless if a voluntary standard informally found to be entitled to deference under § 2056(b) were deemed a consumer product safety standard within § 2075(a). Furthermore, the phrase "in effect" would lack substance if mere informal action by the Commission or its staff could provide a voluntary standard with preemptive effect. Cf. 15 U.S.C. § 2058(g)(1) ("[e]ach consumer product safety rule shall specify the date such rule is to take effect ...").

This reading of the statute is in accord with the legislative history of § 2075(a), which was enacted in 1972 as § 26(a) of the Consumer Product Safety Act P.L. 92–573, 86 Stat. 1207. The House Report on the language which became § 2075(a) states, "[i]t is intended that Federal authority— once exercised—occupy the field and broadly preempt State authority to regulate the same product hazards". H.Rep.No. 1153, 92d Cong., 2d Sess. 49

(1972) (emphasis added). At that time, the statute did not require that the Commission rely on voluntary standards. The only consumer product safety standards to which § 2075(a) might refer were those promulgated by the Commission under former 15 U.S.C. § 2056(a) (1972), which provided: "[t]he Commission may by rule, in accordance with this section and section 2058 of this title, promulgate consumer product safety standards". Sections 7 and 9 of the CPSA set forth an elaborate procedure, punctuated and commenced by public notice in the Federal Register.[2] Thus, the legislative intent originally underlying § 2075(a) was that federal authority, exercised through the orderly promulgation of consumer standards, would preempt state regulation. The Congress which enacted § 2075(a) did not intend that Commission action which did not involve public findings and notice would preempt state regulation.[3]

According to plaintiff, enactment of § 2056(b) changed this result. Section 2056(b) was added as § 1202 of the Consumer Product Safety Amendments of 1981, P.L. 97–35, Title XII, 95 Stat. 357. The NKHA asserts that informal reliance on a voluntary standard under § 2056(b) is sufficient to require preemption of inconsistent state law under § 2075(a). If this were so, the preemptive effect of § 2075(a) would be considerably enlarged. I do not believe Congress would intend such a change in the meaning of statutory language without mentioning it in the legislative history.

The Conference Committee in fact faced the question of the preemptive effect of voluntary standards twice. House Conference Report No. 97–208, 97th Cong., 1st Sess., reprinted in 1981 U.S.Code Cong. & Ad.News 396, 1010, 1233, 1251. The House bill provided that if a voluntary standard which adequately addresses the risk of injury was submitted to the Commission in

---

2. This procedure was consolidated into the present § 2058 in 1981.

3. The CPSA was amended by the Consumer Safety Improvements Act of 1976, P.L. 94–284, 90 Stat. 503. Congress did not amend

§ 2075(a), only reiterating that a federal requirement in effect would preempt state law. House Conference Report No. 94–1022, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Ad.News 993, 1017, 1031.

response to notice published in the Federal Register, the Commission must terminate its rulemaking proceeding and publish a notice in the Federal Register which: "(1) states that the voluntary standard adequately addresses the risk of injury; (2) notifies the public that the agency will rely on the voluntary standard to address the risk of injury; and (3) defines the preemption to be accorded the voluntary standard under section 26 of CPSA." *Id.* at 1233. The Committee substituted a provision concerning the administrative procedure for promulgating standards which made no reference to preemption. *Id.* at 1234–1235. The House bill also proposed to amend § 26(a) of the CPSA "to provide that those voluntary standards which the agency has stated in the Federal Register it will rely upon to address risks of injury preempt all State and local laws which are not identical". *Id.* at 1251. In conference, the House receded. *Id.*

Instead of relying on these provisions of the House bill, the Committee adopted § 1202, 15 U.S.C. § 2056(b), which expands upon the bill's vague requirements that a voluntary standard be adequate or likely to address the risk of injury. *See id.* at 1232. Section 2056(b) provides that the Commission must rely on voluntary standards whenever "compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed and it is likely that there will be substantial compliance with such voluntary standards". As the Committee declined to provide voluntary standards which the Commission determined met this standard with preemptive effect, even though the preemption issue was raised before it, I infer that it did not intend to enlarge the coverage of § 2075(a) to include voluntary standards. *Cf. Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974) (Conference Committee's deletion of provision "strongly militates against a judgment that Congress intended a result that it expressly declined to enact").

■ I therefore hold that where the Commission has not made public findings that a voluntary standard meets the requirements of § 2056(b) pursuant to § 2058(b)(2), the voluntary standard does not constitute a consumer product safety standard in effect within § 2075(a).[4] Accordingly, UL 647 does not preempt M.G.L. c. 148, §§ 5A and 25B.

This case illustrates the confusion which would reign if a contrary holding were reached. Assuming that a voluntary standard meeting the requirements of § 2056(b) had preemptive effect without findings and notice under § 2058(b)(2), manufacturers would attempt to preempt inconvenient state or local laws by demonstrating the Commission had determined that voluntary standards concerning their products met the § 2056(b) standards. As a result, informal Commission actions relating to a voluntary standard would have to be scrutinized to determine whether they have preemptive effect.

In asserting the Commission has determined that UL 647 is a "voluntary consumer product safety standard" within § 2056(b), NKHA relies on (1) the Commission's denial of the petition of the Director of the Fire Department of Newark, New Jersey, in 1980, and (2) the Commission's study of kerosene heaters and input into the 1984 version of UL 647. The Commission's formal action in denying the petition, however, did not implicitly determine that UL 647 is a voluntary standard by relying on it. The Commission determined only that "it is not reasonably necessary at this time to address, by mandatory regulation, any risk of injury from fire hazards that may be associated with portable kerosene heaters". 45 Fed.Reg. 70961, 70962 (October 27, 1980). I read the Commission's conclusion as a finding that no standard was necessary at that time. *Cf.* § 2056(a) ("[a]ny requirement of such a standard shall be reasonably necessary to prevent or reduce an unreasonable risk of injury asso-

---

**4.** I do not decide whether a voluntary standard which is recognized as worthy of reliance under § 2056(b) pursuant to § 2058(b)(2) would be entitled to preemptive effect under § 2075(a).

ciated with such product"). The decision was based on the "relatively low" incidence of injuries and extent of consumer use. 45 Fed.Reg. 70962.[5]

It is true that the Commission also noted its expectation that "the new UL voluntary standard will have substantially more stringent requirements" to address the risk of fire from kerosene heaters. *Id.* However, this expectation does not compel reliance on the standard under § 2056(b). Under that section, reliance is mandated only where (1) "compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed", and (2) "it is likely that there will be substantial compliance with such voluntary standards". The Commission did not make a finding regarding either prong of this requirement. *See* 45 Fed.Reg. 70961 ("a more stringent voluntary standard now under development *may* be adequate to address any fire hazard that may be associated with portable kerosene heaters ...") (emphasis added).

Nor does the ongoing staff study of kerosene heaters and participation in the development of UL 647 involve a determination that UL 647 meets the criteria of § 2056(b). Plaintiff points out that the staff recognized the existence of the standard in the 1983, 1984 and 1985 reports. However, the reports do not contain any explicit findings regarding the two criteria necessary before the Commission must defer to a voluntary standard under § 2056(b). In regard to the first criterion, whether the standard would eliminate or adequately reduce the risk of injury, the staff initially identified several areas of concern and recommended that the Commission be involved in development of the standard. Pl.Ex. 5 at 44–45 (1983 Report). The staff did in fact make suggestions for the improvement of UL 647 to Underwriters Laboratories, some of which were incorporated into the standard. Pl.Ex. 7 at 1 (1985 Report). However, the staff has

stated, "[t]here are still areas of heater performance which need further investigation and provisions which are not as stringent as ES [Engineering Staff] believes they should be". *Id.* at 24; *see id.* at 27–30. It is clear that the staff sees UL 647 as a standard in flux. *Id.* at 3, 24. The staff reports do not support a finding that the Commission has determined that the standard adequately reduces the risk of injury.

The Commission has not even addressed the second criterion, whether it is likely there will be substantial compliance with the standard. Although the 1983 report states that sales of heaters listed as complying with UL 647 (before the 1984 revisions) comprised an estimated 90% to 98% of total market sales, it adds that approximately 31 models then on the market were not UL-listed. Pl.Ex. 5 at 17. The 1985 report states that a field monitoring program to assess industry conformance with UL 647 was to be conducted during fiscal year 1985. Pl.Ex. 7 at 6.

In short, the Commission's activities represented on the present record do not indicate that the Commission implicitly recognizes UL 647 as a standard to which it must defer under § 2056(b). Plaintiff makes numerous assertions to the contrary, but fails to cite to any portion of the record to back them up. Consequently, even if voluntary standards informally found to meet the criteria of § 2056(b) were accorded preemptive effect under § 2075(a), UL 647 does not preempt M.G.L. c. 148, §§ 5A and 25B.

### 2. *Conflict and Implied Preemption.*

NKHA next asserts that M.G.L. c. 148, §§ 5A and 25B are preempted by the CPSA because the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress". *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

**5.** The petition was brought under 15 U.S.C. § 2059, which was repealed by the Consumer Product Safety Amendments of 1981, P.L. 97–35, Title XII, § 1210, 95 Stat. 357. That the requirements of § 2056(b) do not figure in the Commission's analysis is understandable as they did not yet exist; § 2056(b) was enacted as § 1202 of the 1981 Act.

In enacting the CPSA, Congress found that "control by State and local governments of unreasonable risks of injury associated with consumer products is inadequate and may be burdensome to manufacturers". 15 U.S.C. § 2051(a)(4). Congress also stated that one purpose of the CPSA was "to develop uniform safety standards for consumer products and to minimize conflicting State and local regulations". 15 U.S.C. § 2051(b)(3). NKHA contends that "the denial of the benefits of federal preemption to a voluntary standard where the [Commission] has worked with the industry representative over a multi-year period to develop that standard would clearly frustrate" the purposes and objectives of Congress. Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment at 15.

I do not agree that the congressional purpose of developing uniform standards and minimizing—not eliminating—conflicting state and local regulation requires that a voluntary standard developed with Commission involvement be given preemptive effect. Although Congress did articulate a concern for uniform regulation in § 2051(b)(3), that concern must be interpreted in light of the statute as enacted by Congress. The express preemption provision of the CPSA accords preemptive effect only to consumer product safety standards in effect. § 2075(a). Congress thus restricted the preemptive effect of the statute to situations where the Commission had promulgated a regulation after determining it was reasonably necessary to address an unreasonable risk of injury. § 2056(a); *see Southland Mower v. Consumer Product Safety Comm.*, 619 F.2d 499, 508–509, 523 (5th Cir.1980); *D.D. Bean & Sons v. Consumer Product Safety Comm.*, 574 F.2d 643, 649 (1st Cir.1978). Such a scheme clearly contemplates that state and local regulation will continue until the Commission has acted. Accordingly, the congressional purpose underlying the CPSA does not require that voluntary standards to which the Commission has implicitly deferred preempt state and local regulation.

This analysis also applies to the NKHA's assertion that the federal regulatory scheme of the CPSA is so comprehensive that it manifests a congressional intent to occupy the field, which, if true, would preempt any state regulation. *E.g., City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973). In light of the limited preemption expressly provided for in the CPSA, the statute is not so comprehensive as to evidence a broad congressional intent to displace state law. Plaintiff points out that Congress set forth an accommodation provision in the CPSA which permits state or local regulation with permission of the Commission if the regulation does not unduly burden interstate commerce. 15 U.S.C. § 2075(c). However, these provisions are irrelevant because they only apply when state law would otherwise be preempted under § 2075(a).

Two additional factors support the conclusion that the CPSA and the Commission's activities do not impliedly preempt the Massachusetts statutes. First, there is a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause". *Hillsborough County*, 105 S.Ct. at 2376; *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977).

Second, the Commission has taken the position that voluntary standards on which it relies do not have preemptive effect. In 1984, the Commission revoked its mandatory safety standard for unvented gas-fired space heaters. 49 Fed.Reg. 46108 (November 23, 1984). The standard had required that all unvented gas-fired heaters have an Oxygen Depletion Safety Shutoff System ("ODS"). *Id.* When the standard went into effect, 46 states applied for an exemption from preemption under § 2075(c). *Id.* at 46109. Rather than consider the applications, the Commission initiated a proceeding to revoke the standard because (1) a revision of an American National Standards Institute ("ANSI") standard had recently been completed, and (2) the Commission expected that all heaters would contin-

ue to have ODS devices and 95% would meet the ANSI standard. *Id.* Of course, these are the two factors set forth in § 2056(b).

The Commission considered a wide range of factors in deciding to revoke the standard, including the economic burden of conflicting state regulation. *Id.* at 46113. Indeed, one company opposed revocation on the ground that it would result in restrictive state and local regulation, while one nationwide distributor contended that local bans on heaters should not be permitted even if the standard were revoked. *Id.* at 46112. The Commission revoked the standard and, despite these arguments, held the revocation ended any preemptive effect under § 2075(a):

> With the revocation of the Commission's space heater standard, the preemption provisions of [§ 2075] will no longer apply ... To the extent that any state or local requirements may have been preempted by the Commission's standard, such preemption will no longer exist.

*Id.* at 46114. Such a statement "is dispositive on the question of implicit intent to pre-empt unless either the agency's position is inconsistent with clearly expressed congressional intent ... or subsequent developments reveal a change in that position". *Hillsborough County,* 105 S.Ct. at 2376. Neither condition applies here. The Commission apparently views state and local regulation as permissible despite its actions relating to kerosene heaters, *see* Pl.Ex. 4 at 2; Pl.Ex. 5 at 17, 20, and there is no clearly expressed congressional intent inconsistent with the Commission's statement.

*Summary.*

Plaintiff's motion for partial summary judgment on the preemption issue is DENIED. Defendants' motion for summary judgment is ALLOWED as to preemption. The NKHA shall file a brief addressing the other issues raised by defendants by June 16, 1986. Consideration of these issues is postponed until that time.

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The National Kerosene Heater Association, Inc. ("NKHA") brought this suit to challenge the constitutionality of M.G.L. c. 148, §§ 5A and 25B, which bans the sale and use of unvented liquid-fired kerosene heaters in Massachusetts. The complaint alleges that Chapter 148 is preempted by the Consumer Product Safety Act ("CPSA"), 15 U.S.C. §§ 2501 et seq., and violates the Commerce Clause and the Equal Protection and Due Process Clauses. NKHA seeks a declaratory judgment that the ban is unconstitutional, and an injunction against its enforcement. By Memorandum and Order dated May 19, 1986, I ruled that the CPSA does not preempt Chapter 148. The case is now before me on the defendants' motion for summary judgment on the other issues.[1]

Preliminarily, NKHA has moved to stay these proceedings pending administrative resolution of an NKHA rulemaking petition to the Consumer Products Safety Commission ("CPSC"). The motion is based on the doctrine of primary jurisdiction. NKHA suggests that deference to CPSC proceedings would be proper "as a means of coordinating business between courts and administrative agencies." NKHA's Memorandum in Support of Plaintiff's Motion to Stay Proceedings, citing *Distrigas of Massachusetts Corp. v. Boston Gas Co.,* 693 F.2d 1113, 1118 (1st Cir.1982).

I find NKHA's interpretation of primary jurisdiction convenient, to say the least. NKHA brought this action in the first place. It chose the federal district court as the proper venue for preventing enforcement of the ban. It did so after years of CPSC Proceedings after which the

---

**1.** The complaint names the Commonwealth of Massachusetts, and the Commonwealth's Attorney General, Secretary of Public Safety, and Fire Marshal. The three individuals are named individually and in their official capacities. However, plaintiff has now agreed to dismissal as against the Commonwealth, and as against the named defendants individually.

CPSC specifically decided not to regulate kerosene heaters. When I issued my May 19, 1986, Memorandum and Order in which I found that Chapter 148 was not preempted by the CPSA, NKHA apparently decided that it had a better idea; it would seek CPSC regulatory action on kerosene heaters, in the hope that that action would preempt Chapter 148. The issues remaining in this forum do not depend on CPSC action. I will play out the hand the plaintiff dealt. The motion for stay is denied.

*Commerce Clause*

NKHA argues that the Massachusetts ban on kerosene heaters violates the Commerce Clause of the Constitution. It is, of course, well established that the so-called "dormant" Commerce Clause, in the absence of federal legislation on a given subject, can act as a self-executing limitation on state authority to make laws which impose burdens on interstate commerce. *See, e.g., South-Central Timber Development, Inc. v. Wunnicke,* 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). NKHA maintains that the Massachusetts ban does impose such an improper burden.

In moving for summary judgment on this issue, defendants make two arguments. They argue, first, that Congress has specifically authorized state legislation such as Chapter 148, and second, that even if Congress has not authorized such legislation, Chapter 148 does not impose an unconstitutional burden on interstate commerce. However, the Supreme Court has stated that the proper method in analyzing dormant Commerce Clause arguments is to take these issues in reverse order. In *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 35, 100 S.Ct. 2009, 2014, 64 L.Ed.2d 702 (1980), the Court stated that where preemption is not an issue, "federal law becomes important only if it appears that the [state] statutes cannot survive without federal authorization." Therefore, I must first decide whether the ban violates the Commerce Clause. Only if I decide that it does need I consider whether Congress has authorized such a violation.

The limit placed by the Commerce Clause on state legislation "is by no means absolute. In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Lewis, supra,* at 36, 100 S.Ct. at 2015 (citations omitted). In recent years, the Supreme Court has applied the test first articulated in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit,* 362 U.S. 440, 443, [80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960) ]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike* made clear that the Court does not anticipate the use of any serious balancing of the state interest against the burden on interstate commerce, at least where the state statute addresses concerns at the core of state police powers. The Court noted that "[o]ccasionally the Court has candidly undertaken a balancing approach in resolving these issues, ... but more frequently it has spoken in terms of 'direct' and 'indirect' effects and burdens. *Id.* Where the purpose of the statute is clearly within state police powers, and the effect is not to produce any economic discrimination, then the statute is only an indirect burden on interstate commerce, and only the most minimal sort of balancing, if any, is necessary.

This deference to nondiscriminatory core police power legislation is illustrated by *Huron Cement Co. v. Detroit,* 362 U.S.

440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), which was the source of the *Pike* test. In *Huron Cement*, the Court stated that "[s]tate regulation, based on the police power, which does not discriminate against interstate commerce or operate to disrupt its required uniformity, may constitutionally stand." *Id.*, at 448, 80 S.Ct. at 818 (citations omitted). There is no doubt that a law designed to further fire safety efforts is at the heart of Massachusetts' police powers, so the question is whether the law either discriminates against interstate commerce or impedes any necessary uniformity.

 Chapter 148 does not discriminate against interstate commerce. It bans the sale and use of all unvented space heaters wherever they were manufactured. It therefore is not an example of "simple economic protectionism," *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978), which is clearly prohibited as a "direct" regulation of interstate commerce. *Edgar v. Mite Corp.*, 457 U.S. 624, 640, 102 S.Ct. 2629, 2639, 73 L.Ed.2d 269 (1982). NKHA attempts to paint Chapter 148 as discriminatory in its effect because there are no Massachusetts manufacturers of unvented kerosene heaters, so the only producers injured by the ban are out-of-state producers. This argument distorts the very meaning of the word discrimination. Discrimination implies inequality. Inequality implies comparison, one group benefiting at the expense of another. NKHA cannot show that Chapter 148 discriminates against out-of-state manufacturers of unvented kerosene heaters, because no Massachusetts manufacturers are benefiting at NKHA members' expense.[2] NKHA's argument has already been rejected by the Supreme Court. In *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91,

*reh. denied*, 439 U.S. 884, 99 S.Ct. 232, 233, 58 L.Ed.2d 200 (1978), the Court upheld a Maryland law which prohibited oil producers and refiners from operating retail service stations in Maryland. Various producers and refiners challenged the statute on the ground that it discriminated against interstate commerce. The Court stated that:

> Plainly the Maryland statute does not discriminate against interstate goods, nor does it favor local producers and refiners. Since Maryland's entire gasoline supply flows in interstate commerce and since there are no local producers or refiners, such claims of disparate treatment between interstate and local commerce would be meritless.

*Id.*, at 125, 98 S.Ct. at 2213. NKHA's claim of discrimination is similarly meritless because the Massachusetts ban does not benefit any Massachusetts manufacturer at the expense of interstate commerce in the same items.

The next question is whether the Massachusetts ban impedes any required uniformity among the states. *Huron Cement, supra.* There is some question whether the Massachusetts ban actually even disrupts uniformity. A total ban certainly does so to a lesser extent than a regulation which imposes certain manufacturing standards which conflict with manufacturing standards imposed by other states. Under the ban, kerosene heaters can manufacture the same unvented heater nationwide; they simply may not sell it in Massachusetts. However, it is not necessary for me to decide whether the Massachusetts ban impedes uniformity because I find that even if it does so, it does not thereby impose any unconstitutional burden on interstate commerce.

 I find the CPSC decision not to regulate kerosene heaters determinative of

---

2. NKHA has not argued that the legislation discriminates against out-of-state manufacturers of unvented kerosene heaters in order to benefit Massachusetts manufacturers of any particular substitute for kerosene heaters. Moreover, it is questionable whether they could so argue. The Supreme Court cases have not dealt with substitutes, and to allow a Commerce Clause claim based on such an argument would make it extremely difficult to analyze dormant Commerce Clause cases. Should the Massachusetts ban on kerosene heater sales face heightened Commerce Clause scrutiny if the ban benefits Massachusetts electric blanket manufacturers?

the uniformity issue.[3] The Congressional findings and declaration of purpose regarding the CPSA state that one of the purposes of the CPSA is "to develop uniform safety standards for consumer products and to minimize conflicting State and local regulations." 15 U.S.C. § 2051(b)(2). The CPSC decided, after years of proceedings, not to regulate kerosene heaters. In one report, dated June 1983, the CPSC noted "[t]he existence of state and local restrictions on the sale and use of the heaters." Consumer Product Safety Commission, Kerosene Heater Report, June 1983, at 17. The CPSC specifically noted that ten states, including Massachusetts, had effective bans on kerosene heater sales. Given that one of the purposes of the CPSA is to minimize conflicting state regulations, the CPSC's decision not to regulate kerosene heaters strongly suggests that the CPSC, the agency charged with administering the CPSA, did not consider the statewide bans to impose any undue burden on interstate commerce. I agree with the CPSC that Massachusetts' statewide ban on the sale of unvented kerosene heaters does not impermissibly interfere with the uniformity necessary to maintain interstate commerce.[4]

■ NKHA attempts to portray itself as the friend of consumers, and suggests that depriving consumers of the heaters is itself part of the burden on interstate commerce imposed by Chapter 148. However, this argument has also been disposed of by the Supreme Court. In *Exxon, supra,* the oil refiners and producers argued against the Maryland law by claiming that the law would eliminate low cost gasoline stations maintained by independent refiners. The Court stated that "[i]t may be true that the consuming public will be injured by the loss of the high-volume, low-priced stations operated by the independent refiners, but again that argument relates to the wisdom of the statute, not to its burden on commerce."

■ Much of NKHA's argument, and indeed this entire action, is based on NKHA's claims that "new generation" unvented kerosene heaters which meet Underwriters Laboratories, Inc.'s Standard 647 ("UL 647") are safe. Furthermore, NKHA argues that at least Massachusetts has not demonstrated that beyond genuine dispute that they are unsafe. However, this misconceives defendants' burden. Defendants need not now, nor need they ever, demonstrate that UL 647 heaters are unsafe, or that the ban is wise. Defendants' burden under the Commerce Clause is not really that much different from their burden under the Equal Protection and Due Process Clauses, *infra;* they must show that the members of the General Court could rationally believe that the heaters are unsafe. Even if UL 647 heaters are arguably safe if used properly, the burden on interstate commerce would not clearly exceed the putative benefits if the legislature believed that the risk of dangerous misuse was high enough to justify a ban. The legislature would also be justified in banning them simply because the technology of new generation heaters was so new that their safety record, however seemingly admirable, was not well enough established to

---

3. The May 19, 1986, Memorandum and Order contains a summary of CPSC proceedings in regard to kerosene heaters.

4. I fully realize that preemption issues are the converse of Commerce Clause issues. A decision by Congress (or an administrative agency) not to preempt state law simply means that Congress has chosen not to prevent states from legislating in areas in which they *possess constitutional authority to do so.* The Commerce Clause inquiry is the root question of whether, absent congressional authorization, the states may act. See *Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 959–60, 102 S.Ct. 3456, 3465–

66, 73 L.Ed.2d 1254 (1982), for an exposition of the distinction between preemption analysis and Commerce Clause analysis. Under *Sporhase,* the defendants' suggestion that Chapter 148 passes Commerce Clause muster because it is not preempted is simply wrong. Nonetheless, where the question is whether a law unconstitutionally inhibits uniformity, a determination by the agency charged with administering a law designed in part to achieve uniformity, that, in this case, lack of uniformity is not a problem requiring agency action, strongly suggests that the state statute passes constitutional muster, at least on uniformity grounds.

permit their sale. Finally, the record does indicate that the General Court had some legitimate cause for concern regarding the safety of UL 647 heaters.

■ This case concerns the constitutional validity of a state law, the purpose of which is to protect the safety of Massachusetts citizens. The statute thus goes to the core of legitimate police power. It is beyond dispute that defendants have plausibly asserted that the total ban is necessary to protect Massachusetts citizenry. There is evidence in the record suggesting that the heaters are unsafe. Such a statute only violates the Commerce Clause if the burden on commerce clearly exceeds the putative[5] local benefit. NKHA has not only failed to demonstrate that the burden clearly exceeds the putative benefits, it has barely demonstrated that the statute imposes any burden at all. Even taking this issue in the context of a summary judgment motion, it is beyond dispute, under *Exxon, supra,* that the statute is nondiscriminatory. Furthermore, in light of the purposes of the CPSA, the decision by the CPSC not to regulate kerosene heaters places beyond dispute the conclusion that the statute does not impermissibly interfere with any required uniformity.

Supreme Court dormant Commerce Clause cases make clear that "burden", in its constitutional sense, refers not to any forced changes in market structure or prices or available products. Burden refers to a hindering of the interstate commercial system. Such hindering will generally only be shown by discrimination—by "economic protectionism"—or by interference with uniformity, where uniformity has

been shown to be necessary. *See, e.g., Minnesota v. Clover Leaf Creamery, Inc.,* 449 U.S. 456, 470–75, 101 S.Ct. 715, 727–29, 66 L.Ed.2d 659, *reh. denied,* 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981) (the court's analysis of the burden imposed on interstate commerce by a facially neutral state law based on the police power clearly focused on the question of discrimination).

I have found that the Massachusetts ban survives Commerce Clause analysis under the standards recently articulated by the Supreme Court. NKHA relies on *Schollenberger v. Commonwealth of Pennsylvania,* 171 U.S. 1, 18 S.Ct. 757, 43 L.Ed. 49 (1898) for the proposition that total product bans are not permitted, except perhaps for products that are both inherently dangerous and socially useless. *Schollenberger* does not support such a view of product bans. In *Schollenberger,* the Court struck down a Pennsylvania law banning the sale of oleomargarine because the ban would have had the inevitable effect of preventing the sale of oleomargarine which all parties agreed was safe and unadulterated. Once more, I note that NKHA's characterization of UL 647 heaters as safe will not make them so, nor will it make unreasonable Massachusetts' conclusion that they are not safe. There is evidence in the record from which the General Court could have found that all kerosene heaters are inherently dangerous.

Moreover, those recent cases in which the Supreme Court articulated the standard for evaluating dormant Commerce Clause arguments, such as *Huron Cement, supra; Pike, supra;* and *Lewis, supra,* give no indication that the standard articulated therein should not apply to product bans.

---

**5.** That Massachusetts need not prove beyond dispute the ultimate wisdom of the law, or even that it substantially contributes to its citizens' safety, is shown by the repeated Supreme Court usage of the phrase "the statute ... will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the *putative* local benefits." *Lewis, supra,* 447 U.S. at 36–37, 100 S.Ct. at 2015–16 (emphasis added); citing *Pike, supra,* 397 U.S. at 142, 90 S.Ct. at 847. Webster's Third New International Dictionary defines putative as "1: commonly accepted or supposed; REPUTED [a few of us are a little dubious about these putative human superiorities ...]" As this definition makes clear, courts will uphold state police legislation even where a state cannot empirically demonstrate that the law will be beneficial. The sentence used by Webster's to illustrate the meaning of putative suggests that use of the modifier implies that in fact the matter asserted may not be true. In other words, as long as a state can plausibly assert that a statute will effectuate some police purpose, it need not demonstrate that the statute will in fact succeed in furthering the purpose.

This is not to imply that I think that *Schollenberger* has been overruled: its result is perfectly consistent with the current test. I only hold that the modern test should apply.

NKHA also relies on *Smith v. District of Columbia,* 436 A.2d 53 (D.C.App.1981), which upheld a ban by the District of Columbia on automobile radar detectors, in support of its view that product bans only survive Commerce Clause scrutiny when the product is in some way antisocial. However, *Smith* makes clear that Commerce Clause analysis of product bans is indeed governed by the recent Supreme Court dormant Commerce Clause cases. *Id.,* at 58.

Recent Supreme Court cases have reaffirmed the Court's commitment to the use of the summary judgment procedure. *See, e.g., Celotex Corporation v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,* —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In particular, the Court has confirmed "the traditional authority of trial judges to grant summary judgment in meritless cases." *Celotex, supra,* —— U.S. at ——, 106 S.Ct. at 2552 (citation omitted). While NKHA disputes the merits of the Massachusetts ban on kerosene heaters, defendants need not establish the ban's merits beyond dispute. Given the minimal burden on interstate commerce which the ban imposes, defendants need only demonstrate beyond dispute that there is some evidence that the heaters are unsafe. The merits of NKHA's challenge, as opposed to the merits of the ban itself, are beyond dispute; the ban simply does not conflict with the Commerce Clause.

*Equal Protection and Due Process*

■ The parties agree that the proper standard of review for NKHA's Equal Protection claim is the rational basis test. *See, e.g., Clover Leaf Creamery, supra,* 449 U.S. at 461, 101 S.Ct. at 722. Under this test:

States are not required to convince the courts of the correctness of their legislative judgments. Rather, "those challeng-

ing the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision-maker," ...

[P]arties challenging legislation under the Equal Protection Clause ... cannot prevail so long as "it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable."

*Id.,* at 464, 101 S.Ct. at 724 (citations omitted). As with NKHA's Commerce Clause challenge, Chapter 148 survives this even less onerous test. Again, and even more clearly, defendants need not establish beyond dispute that Chapter 148 is wise legislation. As unfelicitous as it may sound, defendants need only establish beyond dispute that the law's wisdom is debatable. Evidence contained in NKHA's own submissions, in particular the June 1983 CPSC Kerosene Heater report, establishes that the legislature's concerns regarding unvented kerosene heaters were reasonable and rational. "Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken." *Id.* Like the Commerce Clause challenge, Equal Protection Clause challenges to police power economic legislation are quite suited to the summary judgment remedy. Once a state introduces some evidence which could rationally support the law at issue, summary judgment is appropriate because the wisdom of the law is then at least debatable. The evidence before the Massachusetts General Court was sufficient to make at least debatable the proposition that all kerosene heaters pose a threat to public safety.

■ NKHA also argues that the law is invalid because it is too narrowly drawn; it does not ban other types of portable heaters. There are two equally valid responses to this proposition. The first is that "a

legislature need not 'strike at all evils at the same time or in the same way,' ... and ... 'may implement [its] program step by step, ... adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.'" *Id.*, at 466, 101 S.Ct. at 725 (citations omitted). Whether other types of portable heaters are dangerous or not, Massachusetts is entitled to approach their regulation in a piecemeal manner. Moreover, Massachusetts could have rationally found that kerosene heaters do pose a greater threat than other types of portable heaters. Wood stoves are vented. Electric heaters do not require a dangerous liquid fuel source. Again, while NKHA may dispute the conclusion of the General Court, it cannot genuinely dispute the presence of sufficient evidence to make the General Court's decision rational.

NKHA's Due Process claim can be disposed of even more easily. Where an Equal Protection challenge to safety-based economic regulation fails, a Due Process challenge will fail "*a fortiori.*" *Id.*, n. 12; *Exxon Corp., supra,* 437 U.S. at 124–25, 98 S.Ct. at 2213.

NKHA's motion for a stay is DENIED. The action against the Commonwealth of Massachusetts and the named defendants in their individual capacities is DISMISSED. Defendants' motion for summary judgment on NKHA's claims that M.G.L. c. 148, §§ 5A and 25B violates the Commerce Clause and the Equal Protection and Due Process Clauses is ALLOWED.