Scott **MOWERY**, Plaintiff,

v.

**MERCURY MARINE, DIVISION OF BRUNSWICK CORPORATION,** et al., Defendants.

**No. 1:90 CV 1212.**

United States District Court, N.D. Ohio, E.D.

Aug. 13, 1991.

Alton Stephens, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, Ohio, for plaintiff.

Robin Weaver, Squire Sanders & Dempsey, Cleveland, Ohio, for Mercury Marine.

Matthew O'Connell, Reminger 7 Reminger Co., Cleveland, Ohio, for Larson Boats.

## MEMORANDUM OF OPINION

MANOS, District Judge.

On August 7, 1988, at approximately 9:30 p.m., plaintiff Scott Mowery was seriously injured when he was struck by the propeller blade of a powerboat. At the time, he was riding in an inflatable raft on Lake Erie.

On July 10, 1990, Mowery filed the above-captioned products liability action against defendants Mercury Marine and Larson Boats alleging that Mercury Marine's "Mercruiser I/O"[1] drive assembly and Larson Boats' "Delta Sport DC 215" powerboat were defectively designed, manufactured, and constructed because the propeller on Mercury Marine's drive assembly was not equipped with a propeller guard and the design of Larson Boats' powerboat did not include a propeller guard. Mowery also alleges that Larson Boat's powerboat was defectively designed because its "all around light" was mounted in such a way as to obstruct the operator's view. Jurisdiction is asserted under 28 U.S.C.A. §§ 1332 (West Supp.1990) (diversity of citizenship) and 1333 (West 1966) (federal admiralty and maritime jurisdiction).

On February 15, 1991, defendant Mercury Marine moved to dismiss on the ground that the court lacks subject matter jurisdiction over the claim based on its alleged "failure to provide a propeller guard" because it is preempted by the Federal Boat Safety Act of 1971, 46 U.S.C.A. § 4301, *et seq.* (West Sp.Pamph.1991) ("FBSA" or "Act"). On March 6, 1991, Larson Boats filed a motion to dismiss adopting the preemption arguments raised in Mercury Marine's motion.[2] For the following reasons, defendants' motions to dismiss the "propeller guard claims" are granted.

### I.

The Supremacy Clause of Article VI of the United States Constitution[3] gives Congress the power to preempt state law. *See Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208, 105 S.Ct. 1904, 1909, 85 L.Ed.2d 206 (1985); *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 246–47, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959). State law may be preempted by federal law in any of three ways: first, Congress may draft a statute which includes language that explicitly defines the

---

1. "I/O stands for "I[nboard]/O[utboard]."

2. Larson Boats' motion does not address preemption of the claim alleging an "unreasonably dangerous" placement of the "all around light" on the boat's deck. Accordingly, the court renders no opinion on this issue.

3. The Supremacy Clause provides:
   This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
   U.S. Const. art. VI, cl. 2.

extent to which the federal statute preempts state law; second, despite the absence of explicit preemptive language, the wording of a federal statute or its legislative history may evince Congress' intent to occupy a given regulatory field to the exclusion of state law; and third, federal law may impliedly preempt state law to the extent that state law conflicts with a federal regulatory scheme. *Taylor v. General Motors Corp.*, 875 F.2d 816, 823 (11th Cir.1989) (citing *Michigan Canners & Freezers Ass'n v. Agricultural Mktg. & Bargaining Bd.*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984); *International Paper Co. v. Ouellette*, 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987)).

## II.

■ To determine whether a claim is preempted, a court must examine Congressional intent. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299–300, 108 S.Ct. 1145, 1150–51, 99 L.Ed.2d 316 (1988).

### A.

The FBSA's preemption clause explicitly evinces Congress' intent to prohibit states from promulgating recreational boating equipment safety standards that are not identical to those contained in the Act. The preemption clause, codified at 46 U.S.C.A. § 4306 (West Sp.Pamph.1991), provides:

> Unless permitted by the Secretary under section 4305 of this title, a State or political subdivision of a State may not establish, continue in effect, or enforce a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated equipment [4] (except insofar as the State or political subdivision may, in the absence of the Secretary's disapproval, regulate the carrying or use of marine safe-

ty articles to meet uniquely hazardous conditions or circumstances within the State) that is not identical to a regulation prescribed under section 4302 of this title.

*Id.* (footnote added).

The purpose of this provision "is to standardize regulations applicable to the manufacture of boats by precluding states from adopting requirements that conflict with federal standards." *Rubin v. Brutus Corp.*, 487 So.2d 360, 363 (Fla.Ct.App.1986). This purpose is evident from the legislative history of the Act:

> *Section 10.   Federal Preemption*
>
> This section provides for federal preemption in the issuance of boat and equipment safety standards. This conforms to the long history of preemption in maritime safety matters and is founded on the need for uniformity applicable to vessels moving in interstate commerce. In this case it also assures that manufacture for the domestic trade will not involve compliance with widely varying local requirements....
>
> The section does not preempt state law or regulation directed at safe boat operation and use, which was felt to be appropriately within the purview of state or local concern.

S.Rep. No. 248, 92d Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Admin.News 1333, 1341.

The national regulations set out in the FBSA are promulgated by the Secretary of Transportation pursuant to statute:

> The Secretary may prescribe regulations—
>
>     ....
>
> requiring the installation, carrying, or use of associated equipment (including fuel systems, ventilation systems, electrical systems, sound producing devices, firefighting equipment, lifesaving devices, signaling devices, ground tackle,

---

4. "Associated equipment" is defined at 46 U.S.C.A. § 2101 (West Sp.Pamph.1991):

In this subtitle—
  **(1)** "associated equipment"—
  **(A)** means—
  (i) a system, accessory, component, or appurtenance of a recreational vessel; or

(ii) a marine safety article intended for use on board a recreational vessel; but
  **(B)** does not include radio equipment.
*Id.* A propeller guard would be considered "associated equipment" in that it would be an accessory to the drive assembly.

life- and grab-rails, and navigational equipment) on recreational vessels and classes of recreational vessels subject to this chapter, and prohibiting the installation, carrying, or use of associated equipment that does not conform with safety standards established under this section[.]

46 U.S.C.A. § 4302(a)(2) (West Sp.Pamph. 1991). The Secretary's regulatory authority under the Act has been legislatively delegated to the United States Coast Guard.[5]

On February 1, 1990, the Coast Guard adopted as its official position that "[a]vailable propeller guard accident data do not support imposition of a regulation requir-

ing propeller guards on motorboats." *Letter from Robert T. Nelson, Rear Admiral, U.S. Coast Guard, Chief, Office of Navigation and Waterway Services to Mr. A. Newell Garden, Chairman, NBSAC,* at 1 (Feb. 1, 1990).[6] This decision not to promulgate regulations requiring propeller guards was made after the required consultation with the National Boating Safety Advisory Council ("NBSAC").[7] 46 U.S.C.A. § 13110 (West Sp.Pamph.1991). The events leading to the Coast Guard's position not to adopt a propeller guard requirement are as follows.

On May 11, 1988, at the Coast Guard's request, the NBSAC appointed a Propeller Guard Subcommittee to:

---

5. Specifically, the Secretary of Transportation delegated the duties and powers conferred by the Act to the Commandant of the Coast Guard. *See* H.R.Rep. No. 338, 98th Cong., 1st Sess., at 122–23, *reprinted in* 1983 U.S.Code Cong. & Admin.News 924, 934–35 (also reprinted in West Sp.Pamph.1991, at 453–54); Coast Guard Authorization Act of 1988, H.R.Rep. No. 154, 100th Cong., 2d Sess., at 9, *reprinted in,* 1988 U.S.Code Cong. & Admin.News 2361, 2363.

6. There are seven documents attached to defendant Mercury Marine's (and, by incorporation, Larson Boats') motions to dismiss. They are identified as exhibits A through G:

  A.  Letter from R.C. Hill, Chief, State Liason & Compliance Division to Mr. Orin Lahman, Commissioner New York State Parks & Recreation (dated Dec. 22, 1975);

  B.  Memorandum from A.T. Miles, Chief, Operator Compliance Branch to Chief, State Liason & Compliance Division (dated Aug. 18, 1976);

  C.  Letter from O.W. Siler, Admiral, U.S. Coast Guard Commandant to Mr. William Brey, Chief, Division of Law Enforcement, Illinois Department of Conservation (dated Jan. 12, 1977);

  D.  Memorandum from G.H. Patrick Bursely, Chief Counsel, U.S. Coast Guard to Chief, Office of Boating Safety (dated July 13, 1977);

  E.  Report of the Propeller Guard Subcommittee (dated Nov. 7, 1989);

  F.  Minutes of the National Boating Safety Advisory Council, Report of the Committee on Propeller Guards (dated Nov. 6–7, 1989); and

  G.  Letter from Robert T. Nelson, Rear Admiral, U.S. Coast Guard, Chief, Office of Navigation and Waterway Services to Mr. A. Newell Garden, Chairman, National Boating Safety Advisory Council (dated Feb. 1, 1990).

In his brief in opposition to Mercury Marine's motion to dismiss, plaintiff objected to the use of these exhibits on the ground that the documents were not authenticated by affidavit in

the motion and that they contain inadmissable hearsay under Fed.R.Evid. 801. On March 14, 1991, Mercury Marine filed a reply to plaintiff's brief which included the affidavit of Daniel J. Connolly, co-counsel for Mercury Marine, which stated that "[u]pon information and belief[,] each of the[ ] exhibits is a true and correct photocopy of the original document." Affidavit of Daniel J. Connolly, at ¶ 11. Because the court finds that the above documents fall within the ambit of admissible hearsay under Fed. R.Evid. 803(8) (public records) and that the exhibits were adequately authenticated by comparison to the original documents as provided in Fed.R.Evid. 1005, plaintiff's objection is overruled.

7. In prescribing regulations under the Act, the Secretary is required to consult with the NBSAC on: (1) "the need for and extent to which the regulations will contribute to recreational vessel safety"; (2) "[the] relevant available recreational vessel safety standards, statistics, and data, including public and private research, development, testing and evaluation"; and (3) whether compliance with the proposed regulations will "avoid a substantial risk of personal injury to the public" and is "appropriate in relation to the degree of hazard that the compliance will correct[.]" 46 U.S.C.A. § 4302(c) (West Sp.Pamph. 1991).

The NBSAC consists of twenty-one members appointed by the Secretary of Transportation, whom the Secretary considers to have particular expertise, knowledge, and experience in recreational boating safety. 46 U.S.C.A. § 13110. Its membership consists of: seven representatives of state officials responsible for state boating safety programs; seven representatives of recreational vessel manufacturers and associated equipment manufacturers; and seven representatives of national recreational boating organizations and from the general public, at least five of whom shall be representatives of national recreational boating organizations. *Id.*

Review the available data on the prevention of propeller-strike accidents and the Coast Guard Study of various methods of shrouding propellers to prevent contact with a person in the water.

Assess the arguments for and against some form of mechanical guard to protect against propeller strikes reflecting the positions of state boating law administrators, the recreational boating industry, and the boating public.

*Report of the Propeller Guard Subcommittee,* Appendix A (Charge to the Subcommittee). Among the specific points the subcommittee was directed to consider was whether the Coast Guard should "move toward" establishing a federal requirement for some form of propeller guard on recreational boats. *Id.* at ¶ g. The subcommittee held three meetings between September 1988 and May 1989 to study these issues. *Report of the Propeller Guard Subcommittee,* at 2. After considering the available data on propeller strike accidents the testimony of numerous experts, the subcommittee determined that propeller guards are not feasible for recreational boats because they decrease an operator's ability to maintain control over the boat at "normal" speeds, *increase* the probability of striking a body in the water, and create a possibility of causing greater injury to those struck. *Id.* at 20–22.

On November 7, 1989, the subcommittee, by unanimous agreement, formally recommended to the NBSAC that the Coast Guard take no regulatory action to require propeller guards. *Id.* at 24; *Minutes of the NBSAC, Report of the Committee on Propeller Guards,* at 18. The NBSAC unanimously adopted the subcommittee's recommendations on the same date. *Id.* at 19. On February 1, 1990, the Coast Guard adopted the NBSAC's recommendation as its official policy. *Nelson Letter,* at 1. As a result, no provision of the Act requires the use of propeller guards on recreational boats.

It should be noted that no provision of the FBSA prohibits the use of propeller guards either. The decision of the Coast Guard was a decision *not to regulate.*

This decision has the same legal consequence as if the Coast Guard had issued a safety standard declaring that the states are prohibited from adopting a regulation requiring propeller guards on recreational boats. *See Arkansas Elec. Coop. Corp. v. Arkansas Public Serv. Comm'n,* 461 U.S. 375, 384, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1 (1983) ("[A] federal decision to forego regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as much pre-emptive force as a decision to regulate").

Congress has determined, through its statutory delegation of its regulatory authority to the Secretary of Transportation (and then delegated by the Secretary to the Coast Guard), that there shall be no federal propeller guard requirement. Therefore, in the absence of a federal requirement, manufacturers are given the choice whether to install them. Any state requirement compelling them to do so would be preempted under the FBSA.

### B.

The State of Ohio has not legislatively enacted a law or regulation requiring that recreational vessels be equipped with propeller guards; however, if a court were to allow a state jury to award damages for defendants' alleged failure to equip their products with such guards, it would be tantamount to recognition of a state requirement that they be installed—an act explicitly forbidden by the FBSA's preemption clause.

The imposition of damages under state tort law has long been held to be a form of state regulation subject to the Supremacy Clause:

[R]egulation can be as effectively exerted through an award of damages as through some form of prevention relief. The obligation to pay compensation can be, and is indeed designed to be, a potent method of governing conduct and controlling policy. Even the States' salutary efforts to redress private wrongs or grant compensation for harm cannot be exerted to regulate activities that are

potentially subject to the exclusive regulatory scheme. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959); *cf. Vanover v. Ford Motor Co.*, 632 F.Supp. 1095, 1096 (E.D.Mo. 1986) (plaintiff alleged that failure to install an airbag in automobile constituted defective design despite the fact that manufacturer had choice to choose other forms of restraint systems; court found defective design claim expressly preempted) ("If this or any other Court should hold an automobile manufacturer liable in tort for failing to install an airbag system, it would have the effect of requiring all manufacturers to install airbags or face the possibility of enormous liability in tort").

Allowing a jury to conclude that defendants "failure" to provide a propeller guard constitutes a design defect would, in effect, "arrogate[ ] to a single jury the regulatory power explicitly denied to all fifty states' legislative bodies." *Palmer v. Liggett Group, Inc.*, 825 F.2d 620, 628 (1st Cir.1987). Accordingly, the court finds that plaintiff's defective design claim is explicitly preempted by the FBSA.

### C.

Plaintiff argues that the FBSA's "savings clause" allows him to assert his claim under state common law. The savings clause, which preserves certain state common law causes of action, provides:

> Compliance with this chapter or standards, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law.

46 U.S.C.A. § 4311(g) (West Sp.Pamph. 1991).

The purpose of this provision is "to assure that in a product liability suit mere compliance by a manufacturer with the minimum standards promulgated under the Act will not be a complete defense to liability." S.Rep.No. 248, 92d Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Admin.News 1333, 1353.[8] Courts have interpreted this provision to prevent a manufacturer from using compliance with the minimum safety standards set forth in the Act as a defense against liability for defectively designed products that ·are *actually installed. See Mulhern v. Outboard Marine Corp.*, 432 N.W.2d 130 (Wisc.App.1988) (affirming decision to hold manufacturer liable under state law for injuries caused when throttle installed by manufacturer on outboard motor, which was within standards set forth in FBSA, caused boat to lunge forward thus throwing plaintiff overboard into motor's propeller); *Rubin v. Brutus Corp.*, 487 So.2d 360, 365 (Fla.App. 1986) (reversing summary judgment for defendant in case wherein plaintiff was severely injured when boat seat, which complied with FBSA standards, came loose from boat's deck upon boat's impact with fixed channel marker); *cf. Wood v. General Motors Corp.*, 865 F.2d 395, 403 (1st Cir.1988) (court held that claim based on failure to provide airbag was preempted; court suggests that liability could be assessed against defendant who actually installs defective airbag). The savings clause has not been applied to find a manufacturer liable for not installing a device it had a choice not to install.[9] The court finds that the savings clause is inapplicable to this case.

### III.

The court finds that plaintiff's state common law product liability claims based on defendants' "failure to provide a propeller guard" are preempted by the FBSA. Be-

---

8. It should be noted that defendants do not raise compliance with the standards set forth in the Act as a defense. Instead, they argue that because there is no federal regulation requiring or prohibiting propeller guards with which they must comply, a state court jury should not be allowed to circumvent the preemption clause by indirectly creating one in the course of litigation.

9. Defendants could not raise as a defense that they had no duty to install a propeller guard *if they were to install a defective or unreasonably dangerous propeller guard.* In such a case, the savings clause would apply to preserve plaintiff's claim. This is distinguishable from exercising their federally granted choice not to install a propeller guard.

cause the court is sitting as a state court in this case pursuant to its diversity jurisdiction,[10] it must dismiss the preempted claims on the ground that it is without subject matter jurisdiction over them. *Pedraza v. Shell Oil Co.,* 729 F.Supp. 187, 189 (D.Mass.1990). Accordingly, Mercury Marine is dismissed as a party from the case on the ground that the court has no jurisdiction over the only claim asserted against it. The claim against defendant Larson Boats premised on its "failure to provide a propeller guard" is dismissed for the same reason; the court makes no determination on plaintiff's other claim against Larson Boats regarding its allegedly "unreasonably dangerous" placement of the all around light. *See supra* note 2.

IT IS SO ORDERED.

**10.** Although the court's federal admiralty jurisdiction is invoked, only state common law claims are asserted.