Mattie TOLTON, Individually and as surviving spouse of Henry V. Tolton, et al., Plaintiffs,

v.

AMERICAN BIODYNE, INC. and Subsidiaries, et al., Defendants.

No. 1:92CV0698.

United States District Court, N.D. Ohio, Eastern Division.

July 8, 1993.

Lester S. Potash, William M. Crosby, Cleveland, OH, for plaintiffs.

Jane E. Garfinkel, Elizabeth B. Wright, Thompson, Hine & Flory, Cleveland, OH, Jack F. Fuchs, Thompson, Hine & Flory, Cincinnati, OH, for American Biodyne, Inc.

Brian Patrick Downey, Deirdre G. Henry, John M. Baker, Sr., Patrick Mark Dana Dukes, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, for Thomas McArthy, Ph.D.

Theodore M. Dunn, Jr., Kenneth J. Knabe, Janik, Lester & Dunn, Cleveland, OH, for Michael Schur, Ph.D.

William J. Coyne, Sr., Law Offices of William J. Coyne & Associates, Cleveland, OH, for St. Vincent Charity Hosp. & Health Center, M. McKenny, R.N., M. Fink, R.N.

Patrick J. Murphy, Jacobson, Maynard, Tuschman & Kalur, Cleveland, OH, for Drs. Cohn, Stavridis, Ackerman, Alonzo and Kirkland, Lakeland Emergency Associates, Inc.

William J. O'Neill, Thomas P. Meaney, Jr., McDonald, Hopkins, Burke & Haber, Cleveland, OH, for CIGNA.

### MEMORANDUM OF OPINION

MANOS, District Judge.

On July 11, 1991, Mattie Tolton, individually and as surviving spouse of Henry V. Tolton, and Ronald Tolton and Richard Tolton, as co-administrators of the estate of Henry V. Tolton, plaintiffs, filed the above-captioned case against American Biodyne, Inc. and its subsidiaries, Thomas McArthy, Ph.D., Michael Schur, Ph.D., Dr. Gebert of American Biodyne, St. Vincent Charity Hospital, Drs. Cohn, Stavridis, Ackerman, Alonzo and Kirkland, Lakeland Associates, M. McKenny, R.N., M. Fink, R.N., and "John Doe Insurance Company", defendants.

Plaintiffs amended their complaint to name CIGNA Health Plan of Ohio, Inc. ("CIGNA") as a defendant, and CIGNA removed the action from Cuyahoga County Court of Common Pleas to this court pursuant to 28 U.S.C. §§ 1441, 1446, because all claims which relate to employee welfare benefit plans are covered by the Employee Retirement Income Security Act, ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and CIGNA is such a plan. On March 5, 1992, the plaintiffs filed an amended complaint, and on July 10, 1992, they filed a second amended complaint.

In their second amended complaint the plaintiffs allege wrongful death, failure to render proper care, violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, negligent and intentional refusal to admit Tolton for inpatient care in reckless disregard for his safety, negligent and intentional refusal to authorize inpatient treatment for Tolton in reckless disregard for his safety, insurance bad faith, breach of contract, liability of CIGNA for the malpractice of Biodyne on the theory of "joint venture", and loss of consortium.

On August 4, 1992, a motion for summary judgment was filed by American Biodyne and its subsidiaries. On August 28, 1992, motions for summary judgment were filed by CIGNA, by St. Vincent Charity Hospital, M. McKenny R.N. and M. Fink, R.N., by Thomas McArthy, Ph.D., and by Michael Schur, Ph.D. On September 2, 1992, a motion for summary judgment was filed by Drs. Kirkland, Stavridis, and Alonzo, and Lakeland Associates, Inc.

For the following reasons the motions for summary judgment are granted.

### II.

Henry Tolton was employed by United Way and as a benefit of his employment had health insurance through CIGNA. CIGNA contracted with American Biodyne ("Biodyne") for Biodyne to provide mental health and substance abuse services to its members. Pursuant to this arrangement, Tolton went to Biodyne on November 29, 1989, and was seen by psychologist Thomas McArthy, Ph.D.[1] for an intake interview and evaluation.

Tolton told McArthy that he was addicted to crack cocaine sprinkled on marijuana and that he wanted to "get off the stuff". He also said that the police had a warrant out for his arrest due to a traffic offense. Pursuant to Biodyne protocols, McArthy challenged Tolton to remain drug free for five days and to return for outpatient treatment if he met the challenge. At this time Tolton was not suicidal or homicidal and did not mention any past suicidal thoughts or plans. McArthy did not see Tolton again.

On December 5, 1989, Tolton telephoned Biodyne and spoke to Michael Schur, Ph.D. He told Schur that he had last used cocaine on December 3, 1989, and Schur challenged him to remain drug free until December 7, 1989. Tolton told Schur that he did not like the challenge policy of Biodyne.

On December 7, 1989, Tolton again contacted Biodyne. Schur spoke to him and requested that he go to Akron to see McArthy. When Tolton refused, Schur said he would see him that day or the next. On December 8, 1989, Schur saw Tolton, offered him an aggressive outpatient program, and scheduled a follow up appointment in seven days. Tolton did not keep the appointment.

---

1. As a psychologist, McArthy had no hospital admitting privileges.

On January 18, 1990, Tolton telephoned Biodyne and said he was suicidal. The operator was about to connect him with Schur when he said he would call back later and hung up the phone. He then called CIGNA and again expressed suicidal thoughts. Schur called Tolton and Tolton told him that he was not suicidal and made an appointment to see Schur that afternoon. At the meeting Tolton requested inpatient care and Schur told him that he was not authorized to admit patients to the hospital and he needed permission to contact his primary care physician. Tolton refused Schur's request for permission twice and left Biodyne.

He then presented himself to the Emergency Room of St. Vincent Charity Hospital, which contracts with Lakeland Associates to provide it with emergency room physicians, and was seen by Dr. Alonzo, the psychiatrist on duty. Mary Fink, R.N. was on duty that day providing nursing care to patients who arrived for treatment. Dr. Alonzo referred Tolton to the East Side Crisis Shelter.

On January 23, 1990, Tolton was admitted to Bradley House, a state supported 30–day residential drug/alcohol treatment program. He left against staff advice on January 31, 1990.

On February 5, 1990 Tolton entered the New Joshua Center for Hope, a 90–day drug/alcohol treatment program, but did not complete the program.

On February 18, 1990, Tolton returned to St. Vincent's emergency room and was seen and evaluated by a medical doctor on duty. Margaret McKenny, R.N., was the nurse on duty in the emergency room that day. Tolton was referred to his treating physician, Dr. Gebert, after he refused shelter at the East Side Crisis Shelter.

On February 19, 1990, Tolton was treated at the Family Practice Center of University Hospitals of Cleveland and signed a statement agreeing to see a psychiatrist, Dr. Frank, or his treating physician, Dr. Gebert, daily, and to attend daily Alcoholics Anonymous meetings. Also included was the provision "I will not commit suicide without talking to Dr. Frank" and was signed by Frank.

He continued to be seen by Dr. Frank and Dr. Gebert almost daily until March 2, 1990.

On March 2, 1990, he was referred by Bradley House to Orca House, another 90–day state supported drug/alcohol treatment program. He left the program on March 17, 1990.

Tolton drove to New York City, purchased a gun, and returned to Cleveland. On March 23, 1990, the police responded to a call concerning "a male with a gun", who proved to be Tolton. He fled in his car when the police arrived and a chase ensued. Tolton became involved in a car accident, produced a gun while in the car and fired it at his head, fatally wounding himself.

## III. STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) sets forth the standard for granting a motion for summary judgment. It states in part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . .

This standard has been explained by the U.S. Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson* the Court set out the requisites needed to show there is no genuine issue as to a material fact. The Court Stated:

> [a]s to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*Anderson* 477 U.S. at 248, 106 S.Ct. at 2510.

The Court also held that "it is the substantive law's identification of which facts are

critical and which facts are irrelevant that governs." *Id.*

Regarding the existence of a genuine issue of material fact the Court held that summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* However, the Court also noted that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2510. The nonmoving party has the burden of producing operative facts, and the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512. If operative facts are not presented, summary judgment is appropriate.

Once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* 475 U.S. at 586, 106 S.Ct. at 1356. However, any inferences from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Id.* at 587, 106 S.Ct. at 1356.

In *Celotex* the Court explained that the nonmoving party must designate specific facts showing a genuine issue for trial. Summary judgment is appropriate if a party, after adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex* 477 U.S. at 322, 106 S.Ct. at 2552. The moving party is not required to prove the absence of a genuine issue of fact, even with respect to an issue on which the nonmoving party bears the burden of proof. *Id.* at 325, 106 S.Ct. at 2553–54. "Instead ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

The *Celotex* Court also stated that "[o]ne of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses", *id.* at 323–24, 106 S.Ct. at 2553. and that the summary judgment procedure should not be regarded as a "disfavored procedural shortcut" but should be viewed as "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327, 106 S.Ct. at 2555.

## IV. STATE CLAIMS

The plaintiffs assert eight causes of action, in counts one, two, four, five, six, seven, eight and nine, which constitute state law claims. They include wrongful death; liability for Tolton's pain and suffering; breach of contract by CIGNA for not authorizing inpatient treatment in violation of the insurance policy, and reckless disregard for Tolton's safety; breach of contract by American Biodyne for not authorizing inpatient treatment, and reckless disregard for Tolton's safety; liability for wrongful death and malpractice on the theory of a "joint venture" between Biodyne and CIGNA; and loss of consortium by Mattie Tolton.

In *Mowery v. Mercury Marine Div. of Brunswick Corp.,* 773 F.Supp. 1012 (N.D.Ohio 1991), this court held that "[t]he Supremacy Clause of Article VI of the United States Constitution gives Congress the power to preempt state law." *Id.* at 1013. Congress has the power to specifically draft a statute including language defining the extent to which the federal statute preempts state law. *Id.* at 1013–14. In Section 514(a) of ERISA, 29 U.S.C. § 1144(a), Congress defined the extent to which state law is preempted with regard to employee benefit plans.

Section 514 of ERISA provides in pertinent part:

the provisions of this subchapter ... shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.... 29 U.S.C. § 1144(a). *See also Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

In *Cromwell v. Equicor–Equitable HCA Corp.,* 944 F.2d 1272, 1276 (6th Cir.1991), the Sixth Circuit stated that "[t]he United States Supreme Court has held that Congress' intent in enacting ERISA was to completely preempt the area of employee benefit plans and to make regulation of benefit plans solely a federal concern ... The Court consistently emphasizes the broad scope of preemption under ERISA." *Id.* (citing *Pilot Life* ).

■ "State laws" are defined as "all laws, decisions, rules, regulations, or other State action having the effect of law...." 29 U.S.C. § 1144(c)(1). A state law cause of action is preempted if "it has any connection with or reference to [an employee benefit] plan." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985).

■ State claims are preempted if they "relate to" an ERISA plan, whether or not they were so designed or intended and it is not "relevant to an analysis of the scope of federal preemption that [plaintiffs] may be left without remedy." *Cromwell* at 1276 (citing *Caterpillar Inc. v. Williams,* 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)).

■ The Supreme Court has stated that the "pre-emption clause is conspicuous for its breadth." *FMC Corp. v. Holliday,* 498 U.S. 52, 58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990). The purpose of the clause is to "reserv[e] to Federal authority the sole power to regulate the field of employee benefit plans." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 99, 103 S.Ct. 2890, 2901, 77 L.Ed.2d 490 (1983).

■ In this case CIGNA provided a "managed care option" pursuant to the United Way Plan under which Tolton was covered as an employee. CIGNA contracted with American Biodyne, Inc. to provide mental health care services to participants of the plan.

According to statute, ERISA plans include: any plan, fund or program, which ... is ... established or maintained by an employer ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment.

29 U.S.C. § 1002(1).

There is no dispute that the United Way Plan is the type of plan defined by the statute.

Section 502(a) of ERISA, 29 U.S.C. § 1132(a), provides a system limiting one who may file an action, the grounds for the action, and the relief to which one is entitled thereunder. Pursuant to § 502(a), a plan participant or beneficiary may bring an action to recover benefits due under the plan, enforce the participant's rights under the plan, or clarify rights to future benefits. The relief may take the form of accrued benefits due, a declaratory judgment with respect to the participant's rights to benefits, or an injunction against a plan administrator's refusal to pay benefits. A participant may also seek relief for breach of fiduciary responsibility.

Counts one, two, four, five, six, seven, eight, and nine of the Second Amended Complaint allege state law claims which are barred by the ERISA preemption provisions. In a case with very similar facts to this, the Fifth Circuit, citing *Pilot Life* at 481 U.S. 47–48, 107 S.Ct. at 1552–53, held that the plaintiffs' malpractice claim was preempted by ERISA because the plan in that case gave medical advice in the context of making determinations about the availability of benefits. *Corcoran v. United Health Care,* 965 F.2d 1321, 1330 (5th Cir.1992).

Similar to *Pilot Life* and *Corcoran,* American Biodyne makes medical decisions and gives medical advice, but it does so in the context of making a determination about the availability of benefits under the plan and that was the basis of its relationship to CIGNA and the plan in regard to mental health and substance abuse cases. Counts one, two, six, seven, eight and nine asserted against American Biodyne are barred by ERISA.

Similarly Counts one, two and nine asserted against McArthy and Schur are barred by ERISA. Counts one, two, four, five, eight,

and nine asserted against CIGNA are also barred.

## V. CLAIM UNDER EMTALA
### 42 U.S.C. § 1395dd

The plaintiffs' eighth claim is for damages resulting from a violation of the Emergency Medical Treatment and Active Labor Act, EMTALA, 42 U.S.C. § 1395dd, which states in pertinent part:

In the case of a hospital that has a hospital emergency department, if any individual ... comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital emergency department, to determine whether or not an emergency medical condition ... exists.

42 U.S.C. § 1395dd(a).

Plaintiffs allege that St. Vincent Charity Hospital and its emergency room physicians associated with Lakeland Associates were obligated to screen, treat, and admit or appropriately transfer Tolton when he presented himself to the emergency room on January 18, 1990, and February 18, 1990.

The defendants allege that at all times they acted pursuant to statute. They screened, treated and referred Tolton to an appropriate facility, to which Tolton refused to go. They further allege that they were not negligent in the care given to Tolton.[2]

Under the Act definition of emergency condition, a patient who suffers from an "emergency medical condition" is in imminent danger of death or serious disability. *Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131 (6th Cir.1990). The plaintiffs do not allege that Tolton was in imminent danger of death at either time he was seen in the emergency room of St. Vincent Charity Hospital.

In addition, this claim for improper emergency room diagnosis and treatment is a traditional medical malpractice claim not cognizable under EMTALA[3] because it is uncontroverted that Tolton was never denied treatment due to inability to pay or lack of insurance, known as "patient dumping", the central problem sought to be addressed by the Act. *Cleland et al. v. Bronson Health Care Group, et al.*, 917 F.2d 266, 270 (6th Cir.1990).

## VI. CONCLUSION

For the above stated reasons the motions for summary judgment of CIGNA Health Plan of Ohio, Inc., American Biodyne and its subsidiaries, Michael Schur, Ph.D., Thomas McArthy, Ph.D., St. Vincent Charity Hospital and Health Center, M. McKenny, R.N., M. Fink, R.N., Drs. Cohn, Kirkland, Stavridis, Ackerman and Alonzo, and Lakeland Associates, are granted.

IT IS SO ORDERED.

---

2. McKenny and Fink, both nurses in the emergency room of St. Vincent Charity Hospital, are named defendants in this case. At no time did either one of them have authority to admit, screen, treat, or transfer Tolton, or any other patient. Their role was to provide *nursing* care to those persons who came to the emergency room, which they did. All claims against them are dismissed.

3. A medical malpractice claim would be preempted by ERISA.