**TOY MANUFACTURERS OF AMERICA, INC.**

v.

**Richard BLUMENTHAL, Attorney General of the State of Connecticut, and Gloria Schaffer, Commissioner, Department of Consumer Protection, State of Connecticut, individually and in their respective official capacities.**

Civ. No. 2:92–620 (EBB).

United States District Court, D. Connecticut.

Oct. 8, 1992.

---

Duncan Ross MacKay, Robinson & Cole, Hartford, Conn., for plaintiff.

Robert M. Langer, Atty. Gen.'s Office, Anti-trust, Consumer Protection, Hartford, Conn., for defendants Blumenthal and Schaffer.

## RULING ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

ELLEN B. BURNS, Senior District Judge.

Toy Manufacturers of America, Inc. ("TMA") filed this action seeking a declaratory judgment that (1) the Federal Hazardous Substances Act ("FHSA"), as amended, 15 U.S.C. §§ 1261–1277 (1982), pre-empts the toy labeling requirements in Connecticut's State Child Protection Act ("State CPA"), Conn.Gen.Stat. §§ 21a–335—21a–346 (1985), as amended by 1992 Conn. Acts 92–127, § 1 (Reg. Sess.) and 1992 Conn. Acts 92–11, § 57 (May Session); (2) the State CPA constitutes an impermissibly vague criminal statute in violation of the Plaintiff's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution; and (3) the State CPA places an undue burden on interstate commerce in violation of the Commerce Clause of the United States Constitution, Article I, Sec. 8, cl. 3. TMA also seeks preliminary injunctive relief barring the State from enforcing the State CPA.

## I. FACTS

This case presents a conflict between two indisputedly important interests: a state government, exercising its traditional police power, seeks to require labels on toys intended for children over three but which end up in the hands—and sometimes lodged in the throats—of children under three; and on the other side, the companies that make toys complain of the potentially severe economic burden they would face if numerous states each enact different labeling requirements for toys intended for children over three. According to an *amicus* brief supporting Connecticut's legislation, at least 17 children under three have died since 1980 by choking on a toy intended for older children.[1] (Mem. *Amici Curiae* U.S. Public Interest Research Group and Conn. Public Interest Research Group Opp. Prelim. Inj. at 4). And according to the Plaintiff, the potentially huge costs on toy makers is illustrated by the fact that several states have already proposed separate labeling requirements for toys intended for older children. *See* Ex. A to Pl.'s Repl.Mem.Supp.Prelim.Inj. In resolving the tension between two legitimate policy choices—toy safety and nationally uniform standards—the Court will look to the federal legislation which governs toy safety and its preclusive effect upon state law.

The Federal Hazardous Substances Act ("FHSA") governs federal regulation of toy safety. Under the FHSA, the definition of "hazardous substance" includes "[a]ny toy or other article intended for use by children which the [Consumer Product Safety Commission] by regulation determines ... presents an electrical, mechanical or thermal hazard." 15 U.S.C. § 1261(f)(1)(D) (1982). The term "mechanical hazard" includes an item which "if, in normal use or when subjected to reasonably foreseeable damage or abuse, its design or manufacture presents an unreasonable risk of personal injury or illness ...

because the article (or any part or accessory thereof) may be aspirated or ingested...." 15 U.S.C. § 1261(s) (1982).

If a toy or other article intended for use by children is found to be a hazardous substance, the statute commands that it be banned completely from interstate commerce; no amount of labeling can make it safe. 15 U.S.C. § 1261(q)(1) (1982). Pursuant to these statutory provisions, the Consumer Product Safety Commission ("Commission") has classified as a banned hazardous substance "[a]ny toy or other article intended for use by children under 3 years of age which presents a choking, aspiration, or ingestion hazard because of small parts...." 16 C.F.R. § 1500.18(a)(9) (1992). Under the heading "Scope," the regulation is declared to apply to "all toys and other articles intended for use by children under 3 years (36 months) of age that are introduced into interstate commerce...." 16 C.F.R. § 1501.2(a) (1992). The same section continues, "[t]his regulation does not apply to toys or articles which are solely intended for use by children 3 years of age or older." 16 C.F.R. § 1501.-2(c) (1992). The parties have not pointed to, and the Court cannot find, any provision of the FHSA, or of the regulations thereunder, that addresses the sale or labeling of toys intended for children three years old or older which pose a risk of choking due to small parts.

The FHSA contains an express pre-emption provision, the applicability of which is the central issue before the Court. It states in relevant part:

> ... if under regulations of the Commission promulgated under section 2(q) [15 U.S.C. § 1261(q) ] a requirement is established to protect against a risk of illness or injury associated with a hazardous substance, no State ... may establish or continue in effect a requirement applicable to such substance and designed to protect against the same risk of illness or

---

1. At the age of about four months, infants begin to put objects in their mouths, both as a part of exploring the world around them and as a way of relieving teething pains. Until they reach the age of three years, children generally do not have the manual or oral ability to remove or

expel objects from their own throat or mouth. Based on these facts, both state and federal regulators have focused on the risk of choking to children under three because they are most prone to choking on small objects. *See* 53 Fed. Reg. 20865 (June 7, 1988).

injury unless such requirement is identical to the requirement under such regulations.

15 U.S.C. § 1261 note (1982) (Effect Upon Federal and State Law, § (b)(1)(B), Pub.L. No. 94–284, § 17(a), 90 Stat. 510 (1976)).[2]

The State CPA addresses the risk to children under three presented by toys or other articles intended for the use of children between the ages of three and seven. Any such toy that would be banned under the federal standards if it were intended for children under three must be conspicuously labeled to warn that the toy contains small parts which pose a hazard for children under three. Conn.Gen.Stat. § 21a–337 (1985), as amended.

## II. DISCUSSION

■■■■ Before a court may issue a preliminary injunction, the moving party "must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief." *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991). When, as here, the moving party challenges "governmental action taken in the public interest pursuant to a statutory or regulatory scheme, it is held to the higher standard of showing a likelihood of success on the merits." *Plaza Health*

Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir.1989).[3]

### A. *Irreparable Harm*

In a case involving the threatened regulation of airline advertising by seven states, the Supreme Court recently held that the moving party may demonstrate irreparable harm through a showing that State officers have "made clear that they would seek to enforce the challenged portions" of a state statute which is claimed to be pre-empted by federal law. *Morales v. Trans World Airlines, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2031, 2035, 119 L.Ed.2d 157 (1992). Adapting to this case the Court's language in *Morales*, "[plaintiffs are] faced with a Hobson's choice: continually violate the [Connecticut] law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Id.* —— U.S. at ——, 112 S.Ct. at 2035–36. As evidence of harm, TMA asserts that its members would face annual damages of approximately four million dollars, and one-time damages of one-half million dollars, if it complied with the State CPA. Aff. of David Miller, ¶ 11. Whether this alleged quantum of injury is of the same magnitude as that faced by the airlines in *Morales* is unclear; however, since the Defendant does not contest the point, the Court will assume that the monetary injury to TMA of complying with the State CPA is comparable to the injury faced by the air-

---

**2.** The FHSA also contains a pre-emption provision that applies to any substances for which the Commission has enacted a cautionary labeling requirement. *Id.* at § (b)(1)(A). TMA does not allege that this provision is relevant to this case since no federal labeling requirements apply to the risk of choking due to small parts in toys.

**3.** Recent precedent in this Circuit has reexamined the standard for a preliminary injunction against governmental enforcement of a statute. *Haitian Centers Council v. McNary*, 969 F.2d 1326 (2d Cir.1992). According to that decision, a private litigant must meet the higher "likelihood of success" standard when the government defendant acts pursuant to a specific statute promulgated in the public interest, e.g., the Medicaid legislation at issue in *Medical Soc'y of the State of New York v. Toia*, 560 F.2d 535 (2d

Cir.1977) or the pesticide regulations at issue in *Union Carbide Agric. Prod. Co. v. Costle*, 632 F.2d 1014 (2d Cir.1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981). In contrast, when the government defendant acts pursuant to a more generalized grant of authority, e.g., the authority to exclude aliens under immigration laws, a court may, depending upon the circumstances, find that "no party has an exclusive claim on the public interest." *Haitian Centers Council*, 969 F.2d at 1338–39. In such a case, a private litigant is held only to the lower "sufficiently serious questions" standard. This Court finds that the statute at issue here, the State CPA, provides for a specific grant of regulatory authority and is promulgated in the public interest. Accordingly, the Plaintiff will be held to the higher "likelihood of success" standard.

lines in *Morales* and therefore is sufficiently great to justify a finding of no remedy at law.[4] Accordingly, the Court finds that the Plaintiff meets the first prong of the test for injunctive relief.

### B. *Likelihood of Success on the Merits*

#### 1. Pre-emption

■ In analyzing whether a state statute is pre-empted, a court must "start with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981) (pre-emption not favored in absence of "persuasive reasons"); *Motor Vehicle Mfrs. Ass'n v. Abrams*, 899 F.2d 1315, 1319 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991). The presumption makes particular sense in light of the fact that, if a court erroneously finds pre-emption, the State has no recourse, whereas if a court errs in the other direction, Congress can make its pre-emptive intent explicit. As Chief Justice Rehnquist has emphasized: "Unless the requisite pre-emptive intent is abundantly clear, we should hesitate to invalidate state or local legislation for the added reason that 'the state is powerless to remove the ill effects of our decision, while the national government, which has the ultimate power, remains free to remove the burden.'" *City of Burbank Lockheed Air Terminal, Inc.*, 411 U.S. 624, 643, 93 S.Ct. 1854, 1864, 36 L.Ed.2d 547 (1973) (Rehnquist, J., dissenting) (quoting *Penn Dairies, Inc. v. Milk Control Comm'n*, 318 U.S. 261, 275, 63 S.Ct. 617, 624, 87 L.Ed. 748 (1943)); *see also Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 488 (9th Cir.1984), *cert. de-*

*nied,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985).

■ The presumption against pre-emption "is particularly apt when ... state law said to be preempted is within the states' traditional police powers." *Rogers v. Conrail*, 948 F.2d 858, 859 (2d Cir.1991). The "regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 719, 105 S.Ct. 2371, 2378, 85 L.Ed.2d 714 (1985). The state legislation at issue here is, of course, manifestly concerned with health and safety matters.

■ Pre-emption may be found to be either expressed or implied, depending on "whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Gade v. National Solid Wastes Management Ass'n*, —— U.S. ——, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)); *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). Pre-emption by implication falls into two categories: (1) field pre-emption, whereby "Congress may indicate an intent to occupy an entire field of regulation," *Michigan Canners & Freezers Ass'n v. Agricultural Marketing & Bargaining Board*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984); and (2) conflict pre-emption, whereby "compliance with both state and federal law is impossible," *id.*, or state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *Gade*, —— U.S. at ——, 112 S.Ct. at 2383.

■ It is not necessary, however, for courts always to pursue both the express

---

4. The State of Connecticut may well be as interested as TMA in a definitive resolution of whether the State CPA is pre-empted by federal law. Such motivation would explain Defendant's complete silence on the question of irreparable harm. Likewise, the State does not raise—and this Court will therefore not ad-

dress—the issue of abstention from considering this motion under the cases in the line initiated by *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), which mandate a heightened standard for injunctions of pending or imminent state criminal actions or civil actions implicating important state interests.

and the implied prongs of the two-pronged pre-emption analysis. As stated most recently by the Supreme Court:

> When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation.

*Cipollone*, —— U.S. at ——, 112 S.Ct. at 2618 (internal quotation marks and citations omitted).

Following this reasoning, one of several concurring opinions in the same case notes "[w]e resort to principles of implied pre-emption—that is, inquiring whether Congress has occupied a particular field with intent to supplant state law or whether state law actually conflicts with federal law—only when Congress has been silent with respect to pre-emption." *Id.* at ——, 112 S.Ct. at 2625 (Blackmun, J., concurring in part and dissenting in part) (citation omitted). Thus, when "Congress expressly states the scope of its pre-emptive reach, the only question is whether the state act falls within the federal sphere." *Cable Television Ass'n v. Finneran*, 954 F.2d 91, 98 (2d Cir.1992).

Since the FHSA contains an express pre-emption provision, this Court's inquiry must be limited to the meaning of that provision. While the analysis of the meaning of the pre-emption clause may resort to extrinsic evidence such as legislative history, the Court will not look to the question of implied pre-emption—i.e., whether Congress has occupied the field of regulation or whether compliance with both the federal and state regulations is impossible.[5]

Turning now to the task of interpreting the express pre-emption clause, the FHSA plainly requires that when the Consumer Product Safety Commission promulgates a regulation intended to protect against a certain kind of risk associated with a particular "hazardous substance," no state may regulate against the *same risk* concerning the *same substance*. The language of the pre-emption clause bears repeating:

> if ... a requirement is established to protect against a risk of illness or injury associated with a hazardous substance, no State ... may establish ... a requirement applicable to such substance *and* designed to protect against the same risk of illness or injury....

15 U.S.C. § 1261 note (emphasis added).

According to the plain language of the pre-emption clause, a state could not require labeling or otherwise regulate against risk of choking from toys intended for children under three because both the risk (choking by children under three) *and* the "substance" (toys intended for children under three) are concededly the subject of

---

**5.** The above-quoted language from *Cipollone* appears as a welcome, definitive clarification that a court must adhere to the terms of an express pre-emption provision. This now-clear admonition against judicial creation of implied congressional intent where Congress has already spoken follows from cases that have forsaken implied pre-emption analysis where an express pre-emption provision existed. *See, e.g., California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 591, 107 S.Ct. 1419, 1430, 94 L.Ed.2d 577 (1987); *cf. English v. General Elec. Co.*, 496 U.S. 72, 78, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990) ("when Congress has made its intent known through explicit statutory language, the courts' task is an easy one."). At core, whether framed as explicit or implicit pre-emption, the issue to be resolved by a court is Congress' intent. *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206

(1985) ("the purpose of Congress is the ultimate touchstone" in determining pre-emption). To that end, this Court will examine the express pre-emption provision as the best evidence of Congressional intent.

In the alternative, however, the Court also reaches the conclusion that by virtue of the express pre-emption clause leaving room for states to regulate where federal regulations have not been enacted, Congress cannot be said to have occupied the entire field. Neither does the Plaintiff face a conflict between state and federal measures: as shown by this Court's interpretation below of the express pre-emption clause, Congress did not have as its only purpose uniformity in all toy regulation or all health and safety regulation. As a result, the State CPA does not stand as an obstacle to the fulfillment of Congress' purpose.

federal agency regulations.[6] In contrast, the pre-emption clause would not prevent a state from regulating against a different risk or from regulating with regard to a different substance. Here, the risk at issue in the state and federal regulatory regimes is the same—the risk to children under three of choking on small parts. The core dispute is whether the two regulatory regimes apply to different "substances." The question for this Court, then, is whether the "substance" regulated by the Commission is all toys with dangerous small parts, in which case the State regulation at issue here would be pre-empted; or whether the "substance" regulated by the Commission is those toys with dangerous small parts that are specifically intended for children under three, in which case, Connecticut would be free to regulate an identical risk from a different substance, i.e., toys intended for older children.

The pre-emption clause provides that a federal regulation of a "hazardous substance" will have pre-emptive effect. Any toy that is found to be a hazardous substance is, under the FHSA, banned from commerce. 15 U.S.C. § 1261(q)(1). As pointed out above, toys intended for children under three which pose a risk of choking are banned hazardous substances. Conversely, toys intended for older children, even if they subject younger children to some risk of choking, are not hazardous substances and therefore remain on the market. Indeed, the very fact of a toy being permitted in interstate commerce is conclusive proof that it is not a "hazardous substance"—for if it were so designated, it would have to be banned. Thus, toys intended for children over three, including those toys that would be labeled under the State CPA, are not "hazardous substances," and do not fall within the regulatory purview of the FHSA. Since pre-emptive effect is given only to regulations "es-

tablished to protect against a risk of illness or injury associated with a hazardous substance," then the requirements applicable to toys intended for children over three are not pre-empted.

Plaintiff argues that the distinction between toys intended for children under three and toys intended for older children is "much too myopic." (Pl.'s Repl.Mem.Supp.Prelim.Inj. at 23). According to the Plaintiff, the Commission has already acted to regulate the safety of toys "for use by children" and, when the Commission considered and rejected a federal labeling requirement similar to that at issue here, *"it did so in the context of supplementing an existing scheme of regulation." Id.* at 24 (emphasis in original). In sum, TMA argues that by rejecting labeling requirements for toys intended for older children, the Commission has already regulated all children's toys, and any labeling requirement would be an extra rule or revision of the rules applicable to the same product.

The administrative record refutes Plaintiff's claims. In the advance notice of proposed rulemaking for the labeling requirement, the Commission never couches its proposal as an extension or supplement of its ongoing regulation of toys in general. Instead, the notice contains a section entitled "The Products and Risks of Injury," with the "product" described as "toys and other articles intended for children three to about six years of age containing or consisting of small parts which may present a choking hazard to children younger than three years of age." 55 F.R. 26082 (June 26, 1990).

Likewise, several cases have addressed pre-emption of State laws where a federal agency had authority to regulate a product, had considered regulating it, but, in the end, had decided against enacting or con-

---

6. The only two cases interpreting the FHSA's pre-emption clause involve application of § (b)(1)(A) of the pre-emption clause, a provision similar but not identical to the subsection before this Court (§ (b)(1)(B)), and in both cases, a state had passed regulations affecting substances that were admittedly "hazardous substances" under the FHSA. *See Lee v. Boyle-*

*Midway Household Products, Inc.,* 792 F.Supp. 1001 (W.D.Pa.1992) (regulating drain cleaner, concededly a "hazardous substance"); *Chemical Specialties Mfrs. Ass'n v. Allenby,* 958 F.2d 941 (9th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 80, 121 L.Ed.2d 44 (1992) (No. 92–1957) (regulating certain chemicals, concededly "hazardous substances").

tinuing a regulation. In each of these cases, the court found no pre-emption of State law. First, in *Baltimore & Ohio R.R. v. Oberly*, 837 F.2d 108 (3d Cir.1988), plaintiffs challenged state restrictions on noise levels caused by refrigerator cars in railroad freight terminals. The relevant federal agency (the Environmental Protection Agency) had promulgated a number of regulations on sources of noise in railroad yards but none specifically for refrigerator cars and none for the general level of noise emitted from a facility (called the "property line" standard). After a rulemaking proceeding specifically considering the need for such regulations, the agency considered them unnecessary. *Id.* at 111. Delaware responded to the noise from refrigeration units in rail yards by enacting a property line standard that would, in effect, require at least one rail yard to stop or modify the use of refrigerator cars. *Id.* at 112.

Predictably, much like TMA, the plaintiffs there argued that the state regulation was at odds with the purpose of the federal statute, i.e., nationally uniform regulations, and that the state decision to regulate "actually conflicts with a federal decision not to regulate." *Id.* at 113. The court found, however, that the "plain language of the preemption section" in the relevant federal statute, the Noise Control Act [42 U.S.C. § 4901 et seq. (1982)], "justifies a narrow interpretation of its effects." *Id.* That pre-emption provision, markedly similar to the pre-emption section of the FHSA, reads as follows:

> *[A]fter the effective date of a regulation under this section* applicable to noise emissions resulting from the operation of any equipment or facility of a surface carrier ... no State or political subdivision thereof may adopt or enforce any standard applicable to noise emissions resulting from the operation of the same equipment or facility of such carrier unless such standard is identical to a standard applicable to noise emissions resulting from such operation *prescribed by any regulation under this section.*

42 U.S.C. § 4916(c)(1) (1982) (emphasis added).

The court noted that the above pre-emption clause applies "in the context of *specific* federal noise regulations. It decrees that preemption occurs after the effective date of '*a* regulation' ... [and that the pre-emption clause] simply is not a global pre-emption provision." *Baltimore & Ohio R.R.*, 837 F.2d at 113–14 (emphasis original). Neither did the court hesitate when confronted with extensive legislative history calling for uniform national standards. Instead, it noted that congressional anticipation of uniform standards was premised on the expectation that the EPA would enact across-the-boards regulations. "Because EPA ultimately promulgated only selected, as opposed to global, regulations, however, we believe that the legislative history indicates, as does the plain language of the statute, an intention that the resulting preemption of state noise regulation be similarly *in* complete." *Id.* (emphasis original).

Finally, the court made clear that the agency decision not to regulate would not, by its own force, have pre-emptive effect. The court made the observation, germane to the issue in this case as well, that: "because agencies normally address problems in a detailed manner and can speak through a variety of means, including regulations, preambles, interpretive statements, and response to comments, we can expect that they will make their intentions clear if they intend for their regulations to be exclusive." *Id.* at 115 (quoting *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 718, 105 S.Ct. 2371, 2377, 85 L.Ed.2d 714 (1985)). The court held, therefore, that there was no pre-emptive effect to the finding by EPA that a regulation was unnecessary since "it is essential that an agency declare, at a high level of specificity, its intention that its *in*action preempt state law before we may assume such a desire and give it legal effect." *Id.* (emphasis original).

In another case largely on point, a Massachusetts District Court considered the effect of the express pre-emption clause in the Consumer Product Safety Act, 15 U.S.C. § 2075(a) (1982), upon the State's

decision to regulate unvented liquid-fired space heaters. *National Kerosene Heater Ass'n v. Massachusetts*, 653 F.Supp. 1079 (D.Mass.1986). The Commission had already considered the risk of injury from kerosene heaters and had decided against regulation of them. *Id.* at 1083. Even though the Commission regulates heaters in general, and even though the Commission had rendered a considered opinion that kerosene heaters need not be regulated, the court found no pre-emption, as follows:

> The express preemption provision of the CPSA accords preemptive effect only to consumer product safety standards ·*in effect*. Congress thus restricted the preemptive effect of the statute to situations where the Commission had promulgated a regulation after determining it was reasonably necessary to address an unreasonable risk of injury. Such a scheme clearly contemplates that state and local regulation will continue *until the Commission has acted.*

*Id.* at 1090 (citations omitted) (emphasis added). Significantly, the pre-emption clause at issue there was enacted as part of the same legislation creating the pre-emption clause of the FHSA; the two pre-emption clauses share the same structure, the same purpose, the same legislative history and virtually the same wording. *See* S.Rep. No. 251, 94th Cong., 1st Sess. 11–13 (1975), *reprinted in* 1976 U.S.C.C.A.N. 993, 1003–05.

Two Supreme Court cases shed supportive, though somewhat indirect, light on this Court's analysis here. In *Puerto Rico Dep't. of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988), the Court considered the pre-emptive effect of a federal regulatory scheme that was no longer in effect. The Court noted that Congress may, in some circumstances, specifically refrain from exercising its regulatory power in order to mandate free-market control (i.e., absence of any regulation), but that "to say that [such a regime] can be created is not to say it can be created subtly." *Id.* at 500, 108 S.Ct. at 1353. The Court had no difficulty finding that the absence of regulations due to the expiration of a regulatory statute, without more, is not sufficient to demonstrate Congressional intent to forbid all regulation. *Id.* at 504, 108 S.Ct. at 1355. Similarly, in *Arkansas Elec. Coop. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983), the Court acknowledged that "an authoritative federal determination that [an] area is best left *un*regulated," *id.* at 384, 103 S.Ct. at 1912 (emphasis original), may be pre-emptive of state efforts to regulate, but that, in order to have pre-emptive effect, the federal measures would need to demonstrate affirmatively that states are to be barred from regulating. *Id.* While neither of the above cases is exactly on point, the message from the Court seems to be that there will be no pre-emptive effect given to a failure to regulate a product unless either the federal regulator or the relevant statute has manifested a clear intent that a product should remain entirely unregulated. The Plaintiff has failed to point to a single statement to that effect.

Although the Supreme Court did not offer guidance as to what a federal regulator would need to do to transform inaction (the failure to regulate) into an affirmative bar to state regulations, one District Court case reveals circumstances, none of them present in the case at hand, in which this Court agrees pre-emption should be found. In *Mowery v. Mercury Marine, Div. of Brunswick Corp.*, 773 F.Supp. 1012 (N.D.Ohio 1991), the court considered the pre-emptive effect of a Coast Guard decision not to require propeller guards on recreational powerboats. The court held that "this decision has the same legal consequence as if the Coast Guard had issued a safety standard declaring that the states are prohibited from adopting a regulation requiring propeller guards on recreational boats." *Id.* at 1016. The court's holding rested on two factors: (1) the express pre-emption clause unconditionally barred any state safety requirement related to recreational boats other than one identical to an existing federal standard, and (2) the legislative history of the statute, as well as the history of maritime law, supported across-the-board federal pre-emption in boat safe-

ty. *Id.* at 1014. Both of these considerations are conspicuously absent in the case at hand. The applicability of the FHSA pre-emption clause is conditioned on the federal agency first enacting a regulation, and the legislative history, as shown below, confirms the understanding that pre-emption applies only as to products for which regulations have been enacted.

■ In the face of the plain meaning of the pre-emption provision in the FHSA, TMA urges the Court to consider that the statute as a whole impliedly pre-empts any state regulation in the area regulated by the State CPA.[7] As explained above, when provided with an express pre-emption provision, a court is foreclosed from pursuing a theory of implied pre-emption. *Cipollone*, —— U.S. at ——, 112 S.Ct. at 2618. Furthermore, when the words of a statutory provision carry an unambiguous meaning—as is the case here—there is no need to examine legislative history to confirm that plain meaning. *Morales v. Trans World Airlines, Inc.*, —— U.S. ——, —— n. 2, 112 S.Ct. 2031, 2038 n. 2, 119 L.Ed.2d 157 (1992); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1214 n. 12, 94 L.Ed.2d 434 (1987). Accordingly, the ensuing analysis is not necessary to or a part of this Court's holding.

The FHSA was amended by the Consumer Product Safety Commission Improvements Act of 1976, Pub.L. No. 94–284, § 16, 90 Stat. 503 (1976), to include the pre-emption clause at issue here. The commentary contained in the legislative history of the Act consistently parallels the actual language of the pre-emption clause, showing an understanding that a state law regulating a substance, item or product may be pre-empted only when the federal agency has affirmatively acted with regard to that substance, item or product. For instance, the Senate Committee with jurisdiction over the original bill commented on the scope of the pre-emption provision:

> The general rule would be that, if the Consumer Product Safety Commission *has in effect a requirement for a product* established to deal with a risk of illness or injury associated with that product, no State or political subdivision may establish or continue in effect a requirement applicable to that product and designed to deal with the same risk of illness or injury unless it is identical to the Federal requirement.

S.Rep. No. 251, 94th Cong., 1st Sess. 4 (1975), *reprinted in* 1976 U.S.C.C.A.N. 993, 996 (emphasis added). Similarly, in the section-by-section analysis later in the same report, the Committee notes that a state law will be pre-empted "[w]hen ... a regulation is *adopted.*" *Id.* at 17 (emphasis added).

The conference report on the same legislation comments that a state law will be pre-empted "if a Federal requirement for a product were in effect." H.Conf.Rep. No. 1022, 94th Cong., 2d Sess. 27 (1976); *reprinted in* 1976 U.S.C.C.A.N. 1017, 1030. An example from the same report is illustrative:

> [A] state standard designed to protect against the risk of injury from a fabric catching on fire would be preempted by a Federal flammability standard covering the *same* fabric even though the Federal standard called for tests using matches and the State standard called for tests using cigarettes.

*Id.* at 29 (emphasis added). Conversely, it stands to reason that if the flammability standard did not cover a *different* fabric, the state could regulate against the risk of injury from it catching fire. As the above quotation reveals, federal standards pre-empt state standards only when both standards deal with the same risk of injury or

---

7. The Court has difficulty discerning exactly what "field" the Plaintiff proposes as the object of the FHSA's implied pre-emptive reach. Is it toy regulation in general, is it the regulation of toys with small parts, or is it the regulation of toys with small parts that pose a risk to children under three? TMA's inability to specify a prin-

cipled measure of the scope of the FHSA's pre-emption (other than to say that the State CPA is pre-empted) demonstrates why we are better advised to rely on an express pre-emption clause whose meaning can be ascertained than on some more nebulous, malleable concept of implied Congressional intent.

illness *and* when both standards apply to the *same product.*

The Court concludes that the plain language, consistent with the legislative history, of the FHSA's pre-emption clause demonstrates that state regulation of a particular product will be pre-empted only if a federal regulation declaring that particular product a "hazardous substance" has been promulgated. That not being the case here, Plaintiff has failed to show a likelihood of success on the merits of the pre-emption claim.

### 2. Void for Vagueness

■ When a statute is challenged as void for vagueness, great latitude is afforded to a regulatory statute enacted to protect public health and safety; the standard requires only that the meaning of the statute be discoverable from its context, or even by resorting to an administrative process. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 *reh'g denied,* 456 U.S. 950, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982).

■ TMA complains that the State CPA might subject its members to criminal liability without giving them adequate notice of exactly what items fall under the regulatory terms of the statute. Noting that the statute requires labeling of toys and *other articles* intended for children between the ages three and seven, TMA asks, "[w]hat is an 'other article'?" When the federal small parts regulations were first enacted, TMA brought suit in this Circuit on this same legal theory, i.e., that the "other articles" regulated under the FHSA could include just about anything. The Second Circuit held that the TMA members are provided sufficient guidance by the familiar federal regulations to which they have no doubt grown accustomed. *See Toy Mfrs. of Am., Inc. v. Consumer Prod. Safety Comm'n.,* 630 F.2d 70, 77–78 (2d Cir.1980). If TMA can discern what "other products" are intended for children under three, they

can also ascertain when an "other product" is intended for older children.

■ TMA offers a second argument that the State CPA is unconstitutionally vague because "the average reasonable person" cannot "reasonably infer the meaning of … the particular sections in the entire code [the Code of Federal Regulations]" upon which the State CPA relies as the standard for determining if a toy or article is "for the use of children between the ages of three and seven" or if it would be a "banned hazardous substance" under the FHSA. (Pl.'s Repl.Mem.Supp.Prelim.Inj. at 28). Again, our Circuit's precedent in *Toy Mfrs. of Am.,* 630 F.2d at 77–78 is dispositive: if, as that case held, a toy maker can be required to read and understand the federal standards that apply to toys intended for younger children, then a toy maker may also be compelled to apply these same standards to toys intended for older children. Accordingly, the Court finds that the Plaintiff has not shown a likelihood of success on the merits of the claim that the State CPA is void for vagueness in violation of the Due Process Clause of the Fifth Amendment.

### 3. Undue Burden on Interstate Commerce

TMA makes a half-hearted claim that the State CPA imposes an unconstitutional burden on interstate commerce. They choose not to address the issue in their legal memorandum accompanying the request for injunctive relief,[8] and their argument in the reply memorandum of law fails to allege more than conclusory support for their theory that any disruption of the "uniform fabric" of toy small parts regulation would unduly burden interstate commerce. (Pl.'s Repl.Mem.Supp.Prelim.Inj. at 31).

■ The primary reason to strike a statute under the dormant Commerce Clause is discrimination against interstate commerce. *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 87, 107 S.Ct. 1637,

---

**8.** Because TMA offers no supportive legal argument in its legal memorandum, the Court would be justified in denying relief under the Com-

merce Clause claim without further analysis. *See* (D.Conn.) Local R.Civ.Proc. 9(a).

**348**

1648, 95 L.Ed.2d 67 (1987); *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). The State CPA does not run afoul of this prohibition since it "visits its effects equally upon both interstate and local business." *CTS Corp.*, 481 U.S. at 87, 107 S.Ct. at 1648 (quoting *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 36–37, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980)).

■ The reach of the dormant Commerce Clause further extends to prohibit states from regulating subjects that "are in their nature national, or admit only of one uniform system, or plan of regulation." *CTS Corp.*, 481 U.S. at 89, 107 S.Ct. at 1649 (quoting *Cooley v. Bd. of Wardens*, 53 U.S. (12 How.) 299, 319, 13 L.Ed. 996 (1852)). A state statute will be invalidated if it "subjects activities to inconsistent regulations." *Id.* at 88, 107 S.Ct. at 1649.

Although child safety standards are a matter of national importance, nothing about the subject inherently requires nationally uniform standards. Indeed, the FHSA evidences at least two ways that Congress envisioned that regulations may admit of several systems or plans of regulation: (1) the express pre-emption clause allows for state regulations where the Commission has not already acted; and (2) the FHSA allows for the Commission to approve divergent state regulations even where a federal regulation has already been promulgated. 15 U.S.C. § 1261 note § (b)(3)(A). TMA may not maintain that the subject of small parts regulation "admit[s] only of one uniform system, or plan of regulation." *CTS Corp.*, 481 U.S. at 89, 107 S.Ct. at 1649.

Neither will the activities of TMA's members be subjected to "inconsistent regulations." To run afoul of this prohibition, a direct conflict between or among state regulations must exist. For instance, in *CTS Corp.*, the Court upheld a challenged state corporate statute where "each corporation will be subject to the law of only one State." *Id.* at 89, 107 S.Ct. at 1649. In *Sadler v. NCR Corp.*, 928 F.2d 48 (2d Cir.1991), the Second Circuit upheld a New York statute which subjected the appellee

corporation, NCR, to different regulatory demands than those enacted by Maryland, NCR's place of incorporation. There, the court held that no direct conflict existed between the two state's statutes and rejected NCR's argument that an impermissible indirect conflict exists where one statute permits conduct which the other forbids. The court stated:

> That argument presses the 'inconsistent regulation' branch of the dormant Commerce Clause theory too far. States are not prohibited from enacting regulations simply because they require more of an entity that is already subject to some less demanding regulation elsewhere.

*Sadler*, 928 F.2d at 54.

In other words, a non-discriminatory state statute will be invalidated under the Commerce Clause only if it is impossible to comply both with it and with other regulations—a situation manifestly not present here. Indeed, since no other jurisdiction besides Connecticut has thus far regulated the risk of choking on small parts from toys intended for children over three, there is no uniformity to be disrupted. *Cf. Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 448, 80 S.Ct. 813, 819, 4 L.Ed.2d 852 (1960) (in Commerce Clause challenge premised on need for uniform regulations, no impermissible burden on interstate commerce found where "appellant argues that other local governments might impose differing requirements [but] it has pointed to none").

■ Finally, the dormant Commerce Clause prohibits state measures that "impose burdens on interstate commerce that outweigh local benefits." *Sadler*, 928 F.2d at 54 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)). "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative benefits." *Pike*, 397 U.S. at 142, 90 S.Ct. at 847.

In one application of the *Pike* balancing test by this Circuit, the court refused to

enjoin a state regulation where the party seeking the injunction has "not shown that the burden here would be 'clearly excessive' compared to the benefit." *Pharmaceutical Soc. of N.Y., Inc. v. Lefkowitz*, 586 F.2d 953, 957 (2d Cir.1978). Having failed even to articulate a coherent theory of how the State CPA burdens commerce, TMA certainly has not provided a requisite showing of how a burden on commerce plainly outweighs the admittedly important state interest.

Even accepting TMA's allegation that its members face economic loss due to labeling requirements, the case law of this Circuit does not support enjoining enforcement of the State CPA. For instance, in *Grocery Mfrs. of Am., Inc. v. Gerace*, 755 F.2d 993 (2d Cir.), *aff'd mem.*, 474 U.S. 801, 106 S.Ct. 36, 88 L.Ed.2d 29 *cert. denied*, 474 U.S. 820, 106 S.Ct. 69, 88 L.Ed.2d 56 (1985), the court accepted as true the allegation that the makers of the state-regulated products, in that case non-dairy cheese substitutes, would face economic loss due to the requirement that their products be labeled as "imitation." The court deemed a "relatively minor burden on commerce" was not sufficient to "clearly outweigh" "an important state interest." *Id.* at 1005; *accord Rochester Gas & Elec. Corp. v. Public Service Comm'n.*, 754 F.2d 99 (2d Cir.1985); *Nat'l Tank Truck Carriers, Inc. v. City of New York*, 677 F.2d 270, 275 (2d Cir.1982).

In a rare instance of finding a regulation's burden "clearly excessive" in relation to the local benefit, the court determined that the challenged regulation (a Connecticut milk safety regulation) offered absolutely no health protection. *Nat'l Farmers Org. v. Comm'r of Agric.*, 711 F.2d 1156, 1163 (2d Cir.1983). TMA does not claim that the State CPA provides no health or safety protection.

In sum, the provisions of the State CPA do not affirmatively discriminate against interstate commerce, do not subject TMA to inconsistent regulations, and any incidental burden on interstate sales of toys is outweighed by the important state interest in child safety. In that light, the Court

concludes that the Plaintiff has not shown a likelihood of success on the merits of the claim that the State CPA violates the strictures of the dormant Commerce Clause.

### III.  CONCLUSION

For the reasons stated above, the Plaintiff's Application for a Preliminary Injunction (Document No. 5) is denied.

SO ORDERED.